**UNITED STATES of America ex rel. James Hoey FEAR**

v.

**Alfred T. RUNDLE, Superintendent, et al.**

**Civ. A. No. 69–78.**

United States District Court, E. D. Pennsylvania.

Sept. 28, 1973.

**54**

Gerald Jay Pomerantz, Philadelphia, Pa., for plaintiff.

James F. McCort, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

NEWCOMER, District Judge.

On January 24, 1968, plaintiff James Hoey Fear slipped on a piece of ice in the bed of a truck while attempting to lift a box of trash over the side thereof. In order to avoid falling on his face, the plaintiff fell on the base of the palms of his hands and his knees. In so doing, it was ultimately determined that plaintiff Fear had fractured the navicular or scaphoid bone (hereafter navicular) in his right wrist. Upon treatment of this fracture by defendant Doctors Edwin Andersen and Elmer R. Place, the fracture failed to unite causing plaintiff a loss of motion and pain in his right wrist for which he sues for damages. At the time of this accident, plaintiff James Hoey Fear was an inmate at the State Correctional Institution at Graterford in Montgomery County, Pennsylvania.

Plaintiff commenced this action on January 13, 1969, and alleged violations of the Civil Rights Act as well as ordinary negligence. The Honorable Harold K. Wood on March 17, 1969, dismissed all counts of the complaint alleging violations of plaintiff's civil rights but permitted the action to proceed as a diversity action.

The case was tried without a jury from May 2 to May 8, 1973. On July 12, 1973, plaintiff's minimum sentence

was commuted by the Honorable Milton J. Shapp, Governor of Pennsylvania, and plaintiff was released from prison. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, this Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The plaintiff James Hoey Fear, at the time this suit was commenced, was a citizen of the State of Maryland.

2. The plaintiff was born in Macon, Georgia, on May 6, 1932, and at the time of trial was forty-one (41) years of age.

3. In 1959, just prior to his arrest, the plaintiff was a citizen of the State of Maryland.

4. In 1959, plaintiff was arrested at the age of 27 and subsequently pleaded guilty to the commission of a series of armed robberies. Plaintiff Fear was initially given a prison sentence of twenty-eight and one-half (28½) to fifty-seven (57) years.

5. Plaintiff's minimum sentence was subsequently reduced and on May 8, 1973, plaintiff had four (4) years, nine (9) months and three (3) days remaining to be served on his minimum sentence and fourteen (14) years, nine (9) months and three (3) days remaining to be served on his maximum sentence.

6. On July 12, 1973, the Honorable Milton J. Shapp, Governor of the Commonwealth of Pennsylvania, commuted plaintiff James Hoey Fear's minimum sentence on recommendation of the Board of Pardons as a result of which plaintiff was released from prison on August 11, 1973.

7. The defendants Alfred T. Rundle, Dr. Edwin Andersen, and Dr. Elmer R. Place are citizens of the State of Pennsylvania.

8. On January 24, 1968, the defendant Alfred T. Rundle was the Superintendent of the State Correctional Institution at Graterford (hereafter Graterford).

9. On January 24, 1968, the defendant Edwin Andersen, M.D. was Medical Director at Graterford and was employed on a full time basis in the capacity of Medical Director. Dr. Andersen provided medical services to the inmates at Graterford on a full time basis.

10. On January 24, 1968, the defendant Elmer R. Place, M.D., was employed on a half-time basis by the Commonwealth of Pennsylvania to provide medical services to the inmates at Graterford prison.

11. Both Doctors Andersen and Place considered themselves to be general practitioners of medicine, and the Court finds that they both were in fact general practitioners on January 24, 1968.

12. On January 24, 1968, plaintiff was a Correctional Industries driver and mechanic at Graterford prison.

13. Part of plaintiff Fear's general duties as a driver of this truck included the disposal of trash from the correctional shops.

14. On January 24, 1968, at approximately 2 p. m., plaintiff was loading trash onto his truck inside the prison when he slipped on a piece of ice in the bed of the truck striking his knees and the base of the palms of his hands.

15. Plaintiff immediately walked to the Maintenance Area to report the accident; shortly thereafter plaintiff was sent to the infirmary for treatment of his wrists.

16. ‘Plaintiff's wrists and in particular his right wrist were examined by Dr. Andersen on January 24, 1968, and he applied a wintergreen liniment and ordered plaintiff to appear the following day for x-rays of both arms.

17. Plaintiff described how he had injured himself to Dr. Andersen on January 24, 1968.

18. On January 24, 1968, plaintiff also received an Ace bandage from the dispensary which he used to wrap his right wrist area.

19. On January 25, 1968, plaintiff returned to the hospital for x-rays of his arms and wrists. Plaintiff also consulted with Dr. Elmer R. Place on January 25, 1968, and as the dispensary card indicates, Dr. Place prescribed an Ace bandage, x-ray of the right hand, and external liniment and aspirin.

20. Sergeant Klock, the x-ray technician, took x-rays of plaintiff's right wrist on January 25, 1968.

21. Sometime shortly after January 25, 1968, Dr. Harper the x-ray specialist who was called in to read x-rays at Graterford Prison, read the x-rays which were taken of plaintiff's right wrist and on January 30, 1968 made the following report:

"The right wrist shows some cystic change proximally in the navicular. There is a fracture zone through this area. The cystic changes were not present on a film in 1965, but suggest the injury may be older than a few days."

22. Dr. Place read the January 30, 1968 x-ray report of Dr. Harper relating to plaintiff's right wrist very soon after January 30, 1968.

23. On February 8, 1968, Dr. Andersen made a notation on plaintiff's dispensary card that plaintiff was to see Dr. Allen E. Hamburg for a navicular fracture.

24. Dr. Andersen saw plaintiff again on February 11, 1968 and prescribed an antibiotic, aspirin and some medication for plaintiff's toes.

25. Dr. Andersen saw plaintiff again on February 14, March 13, and April 3, of 1968, for treatment of complaints not related to plaintiff's right wrist.

26. On April 11, 1968, the plaintiff was examined by Dr. Allen E. Hamburg, orthopedic specialist, regarding plaintiff's navicular fracture.

27. Dr. Hamburg's note of April 11, 1968 states the following:

"Pain in right wrist. Injury January '68. X-ray shows fracture through cyst of navicular. Recommend cast at least two or three months."

28. Dr. Hamburg immediately casted plaintiff's wrist on April 11, 1968.

29. Dr. Andersen made a note to repair the cast on May 3rd and on May 23rd the edges of the cast were padded on advice of Dr. Place.

30. On June 3, 1968, the cast was removed and another cast was applied on that same day. Additional x-rays were requested by Dr. Andersen during this period.

31. On July 11, 1968, Dr. Andersen again ordered additional x-rays and a new cast was applied on this date.

32. Plaintiff's cast was removed some time in August, 1968 and Dr. Hamburg explained to plaintiff that the fracture had failed to unite.

33. Throughout the period from January 24, 1968 until August, 1968, the plaintiff continued to work at his job as Correctional Industries mechanic because he was not given a medical release from work by either Dr. Andersen or Dr. Place.

34. The administrative policy in effect at Graterford during the year 1968, was such that in order for an inmate to be relieved of his regular duties at the prison for medical reasons, the physician or physicians treating such inmate were required to execute a medical release, relieving the inmate from his regular prison duties.

35. If no medical release was executed by the physician or physicians capable of executing such release, the inmate was required to perform his assigned duties. If an inmate refused to perform his duties, he could be subjected to various punishment jobs or be stripped of his privileges.

36. Plaintiff's average pay per week at Graterford Prison as the Correctional Industries mechanic was approximately $31.00 which amount was considered exceptionally high for the prison at the time of the injury.

37. Dr. Leon Weiner, plaintiff's medical expert, had been practicing medicine for a period of fourteen (14) years in Philadelphia County.

38. Philadelphia County is adjacent to Montgomery County.

39. Graterford Prison is located at Graterford, Montgomery County, Pennsylvania.

40. Dr. Leon Weiner was the only medical expert called to testify on behalf of either plaintiff or defendants with the exception of the defendants themselves.

41. Both Drs. Andersen and Place owed plaintiff Fear the duty of exercising that skill and knowledge possessed and employed by physicians generally in the Montgomery County area with respect to the treatment given to plaintiff's wrist.

42. Dr. Leon Weiner is competent to testify as a general practitioner as to the medical standards which existed in January 1968 in Montgomery County with respect to the diagnosis and treatment of a suspected fracture of the navicular bone of the right hand.

43. The medical standard prevailing in the Montgomery County area in January 1968 with respect to the diagnosis and treatment of a suspected fracture of the navicular bone of the right hand under the facts developed in this case required the defendant doctors to immobilize plaintiff's right hand to preclude movement of the fingers and joints, to advise plaintiff not to work and not to use his hand and to order that x-rays be taken as soon as possible.

44. In addition to the standard dictated by finding No. 43, upon receiving the x-ray report by Dr. Harper, the medical standard in the Montgomery County area in January 1968 would require defendants to refer plaintiff to an orthopedic specialist as soon as possible to decrease the likelihood of non-union of the fracture of plaintiff's navicular.

## DISCUSSION

Initially, the Court is faced with two threshold questions of law which bear directly on the outcome of this case. One is the question of the existence *vel non* of diversity jurisdiction and the second relates to the doctrine of sovereign immunity.

We will deal with the question of diversity first. Defendants do not contend that plaintiff has failed to allege the requisite amount in controversy. Rather, they contend that the plaintiff was a citizen of Pennsylvania at the time this suit was commenced on January 13, 1969. Plaintiff asserts that at no time was he a citizen of Pennsylvania prior to commencement of suit or on the date suit was filed.

Plaintiff was arrested and incarcerated in 1959 for his participation in a number of armed robberies all of which were committed in Philadephia, York, and Dauphin Counties. At the time of his arrest, plaintiff stated that he was living in Baltimore, Maryland and his entire institutional record compiled at Graterford tends to support his statement concerning his residence. The defendants would have us infer from the geographic locations of the armed robberies as well as in one instance, the small amount of money involved that plaintiff must have been from Pennsylania. We think this fact that the robberies occurred where they did and the fact that in one instance a small amount of money was involved without more cannot support a finding that plaintiff was a citizen of Pennsylvania.

Along these same lines, plaintiff had been "living" at Graterford Prison for approximately ten years prior to the commencement of this action, but no one contends that he intended to stay there for a period of time beyond that required by his sentence. For these reasons we find that plaintiff Fear was a citizen of Maryland and the necessary diversity of citizenship exists.

A more difficult problem exists with respect to the immunity doctrine which as applied to the Commonwealth of Pennsylvania and certain public officers thereof still exists subject to various exceptions and nuances which are presently being fought out in the state courts at all levels.

We have dismissed the Commonwealth from this action on a prior occasion for the simple reason that the Commonwealth has not yet given its consent to be sued for whatever private civil wrongs it may have committed and therefore may not be sued by a citizen of another state under the Eleventh Amendment of the Constitution of the United States.

However, a more difficult question arises regarding the immunity of Alfred T. Rundle, the Superintendent of Graterford Prison and Drs. Andersen and Place, physicians at Graterford. The defendants are being sued individually for damages arising out of certain alleged negligent acts and/or decisions.

■ We will deal first with defendant Rundle. The Pennsylvania courts have developed a doctrine of immunity over the years which appears to provide protection from litigation for those high public officials who are agents of the state and who have policy-making functions. However, this protection does not apply to lower level employees, it is said, whose functions do not involve the making of policy or involve discretionary decisions. See Ammlung v. Platt, 224 Pa. Super. 47, 302 A.2d 491 (1973). Actually the distinction between high and low level employees appears not to be controlled by the title of the office alone but rather by the nature of the particular decision emanating from that office. The present state of the law of Pennsylvania State employee immunity is unclear because the doctrine of sovereign immunity itself is being subjected to increasing criticism, and the cases appear to be controlled more by the factual situations involved rather than by the application of the high and low level employee dichotomy. Normally, a high level employee engages in more "policy making decisions" than a low level employee. But a high level employee may also make a decision which is purely operational and not discretionary.

It is therefore necessary, in order to determine the reasonableness or unreasonableness of a particular decision by either a high or low level employee, to examine whether or not there are any readily ascertainable standards in existence against which the particular decision or action can be measured. See Hendry v. United States, 418 F.2d 774 (2nd Cir. 1969).

■ Plaintiff alleges that defendant Rundle, acting as Superintendent of Graterford at the time this incident took place, had failed to properly oversee and manage the operation of the prison and had further failed to adequately create and maintain standards of care within the Institution and that such failure constituted a breach of a duty owed to the plaintiff James Hoey Fear. Plaintiff further alleges that defendant Rundle's breach of duty was a substantial factor in bringing about the resultant injury to his right wrist. However, plaintiff has the burden of showing that defendant Rundle's alleged nonfeasance was not in the nature of a policy-making decision so that we can determine whether or not Superintendent Rundle is a high or low level official of the State of Pennsylvania within the meaning of Montgomery v. Philadelphia, 392 Pa. 178, 140 A.2d 100 (1958), where the question of his governmental immunity is raised. We feel confident that if such evidence relating to the nature and function of defendant Rundle's office as Superintendent of Graterford Prison had been introduced, that such evidence would show that he was a high level official within the meaning of Montgomery v. Philadelphia, *supra.* See also Jonnet v. Bodick, 431 Pa. 59, 244 A.2d 751 (1968).

■ Apart from defendant Rundle's position as a high or low level official

which dichotomy we previously indicated does exist but which may have limited utility when deciding a particular case, no evidence was introduced at trial by plaintiff which would indicate a failure on the part of defendant Rundle to exercise reasonable care in discharging those duties which do not involve any discretion on his part in his capacity as a state official which would affect the plaintiff's right to receive adequate medical care at Graterford Prison. Without such evidence, we might well conclude that a separate state agency or sub-agency of the Bureau of Prisons was charged with the duty of administering medical care for all state prisons in Pennsylvania and that Superintendent Rundle had no authority or decision-making power with respect to the adequacy or inadequacy of the medical treatment of prisoners at Graterford on January 24, 1968. We therefore conclude that regardless of whether or not he is immune from tort liability, there is not sufficient evidence in the record upon which to base a finding or conclusion that defendant Rundle was in fact negligent.

■ We must now determine whether or not the defendant doctors are immune from tort liability assuming such liability exists. Each doctor is an employee of the Commonwealth of Pennsylvania. Dr. Andersen on January 24, 1968, was a full time employee and medical director of Graterford Prison, and Dr. Place was a part-time employee of the prison who maintained a private practice outside the prison in Montgomery County. Applying the high and low level official criteria as set forth in Montgomery v. Philadelphia, 392 Pa. 178, 140 A.2d 100 (1958), to the individual doctors in this case does present us with some difficult matters of judgment. First, it is clear from the testimony of the doctors themselves that they were responsible for providing medical treatment and consultation in the prison in January 1968. Dr. Andersen testified that he was the medical director and we find from his testimony that he was in charge of the prison hospital and the prison dispensary and infirmary. Dr. Place was only available in the infirmary during sick call and was not a full time employee of the prison. Both doctors were general practitioners and if in their opinion an inmate needed the services of a specialist, they would call in such specialist for consultation. In the case of Dr. Hamburg, the orthopedic specialist who was on January 24, 1968 the consulting orthopedist for the prison, it was testified that except in real emergencies, approximately fifteen inmates would have to require his services, before he would be called in. However, it appears that the medical standard then and there prevailing at Graterford and in Montgomery County would dictate that an inmate suffering from a possible fracture of the navicular bone be referred to Dr. Hamburg for examination before the list reached the required number of 15 even if the inmate were number 14 on the list to avoid exactly what transpired in this case. It would appear that the "list of 15" decision itself constituted more of a medical decision than a pure policy decision.

Certainly the importance of having physicians at the prison is an obvious and necessary part of running a prison. The importance of who the physicians are becomes even more important in a prison because Drs. Andersen and Place were the only physicians available to the inmates at Graterford at that time on a regular basis.

The last consideration we must test as to whether these doctors are high or low level officials within the meaning of Montgomery v. Philadelphia, 392 Pa. 178, 140 A.2d 100 (1958) is whether or not these doctors have "policy making functions." Dr. Andersen as medical director we must assume, controlled the hours and the days on which sick call was held. He would also as a matter of policy decide how sick call would be conducted and whether or not inmates would line up outside both his and Dr. Place's offices for sick call or wait in their cells for an escort. Dr. Place

might have participated in such discussions at the time the policy was instituted. But none of these policy decisions, if they are policy decisions in the true sense of the word, are being questioned by plaintiff. Likewise, the fact that they are or are not policy decisions would not have changed the medical results complained of in this case; nor would the classification of these doctors as high level or low level officials or employees have changed the results.

This suit does not involve our examination of any discretionary act committed by the defendants. Readily available medical standards do exist in Montgomery County which we can use to decide whether or not defendants' conduct conformed to that standard.

For the foregoing reasons, we are of the opinion that the doctors in this case are not immune from tort liability, if such exists, and may be sued individually by plaintiff Fear. See also Meads v. Rutter, 122 Pa.Super. 64, 184 A. 560; McSparran v. H. J. Williams Co., 249 F. Supp. 84 (E.D.Pa.1965).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter.

2. Dr. Edwin Andersen was a general practitioner of medicine on January 24, 1968.

3. Dr. Elmer R. Place was a general practitioner of medicine on January 24, 1968.

4. Both Drs. Andersen and Place owed plaintiff Fear the duty of exercising skill and knowledge possessed and employed by physicians generally in the Montgomery County area.

5. The standard of medical expertise required of physicians at Graterford Prison is the same standard of medical expertise required of physicians in Montgomery County.

6. The medical standards of the community in January 1968 required that plaintiff's right wrist be immobilized, that he be advised not to use his right wrist or do any work, and that x-rays be taken immediately.

7. The medical standards of the community in January 1968, further required that upon receipt by Drs. Andersen and Place of Dr. Harper's x-ray report, immediate consultation with an orthopedic specialist be ordered.

■ 8. The failure of Drs. Andersen and Place to immobilize plaintiff's wrist constituted a breach of duty owed to the plaintiff by defendants and defendants were therefore negligent. Such negligence was a substantial factor in causing plaintiff's fracture of the navicular to heal improperly.

9. The failure of Drs. Andersen and Place to execute a medical release on behalf of plaintiff Fear so that the plaintiff would not have been required to perform his duties as Correctional Industries mechanic constituted a breach of duty owed to the plaintiff by defendants and defendants were therefore negligent. Such negligence was a substantial factor in causing plaintiff's fracture of the navicular to heal improperly.

10. Section 372 of Title 61 Purdon's Pa.Stat.Annotated states in part the following:

. . . "The physician shall inquire into the mental as well as the bodily state of every prisoner, and when he shall have reason to believe that the mind or body is materially affected by the discipline, treatment, or diet, he shall inform the warden thereof, and shall enter his observation on the journal hereinafter directed to be kept, which shall be an authority for the warden for altering the discipline, treatment or diet of any prisoner, until the next meeting of the inspectors, who shall inquire into the case and make orders accordingly."

11. The above statute was in effect in January, 1968.

■ 12. The failure of either Doctor Andersen or Dr. Place to comply with the statute constitutes negligence

*per se,* and such negligence was a substantial factor in causing plaintiff's fracture of the navicular to heal improperly.

█ 13. The failure of Drs. Andersen and Place to immediately arrange for orthopedic consultation with Dr. Hamburg constituted a breach of duty owed to plaintiff Fear by the defendants, and the defendants were therefore negligent. Such negligence on the part of defendants was a substantial factor in causing plaintiff's fracture of the navicular to heal improperly.

14. The failure of plaintiff's navicular to unite properly was foreseeable.

15. Plaintiff James Hoey Fear was not guilty of contributory negligence.

█ 16. The defendants Drs. Anderson and Place are both liable to the plaintiff James Hoey Fear for any damages proximately caused by their negligence which in this case would be damages arising out of the failure of the navicular bone in plaintiff's right wrist to unite properly.

## DISCUSSION

Dr. Leon Weiner, plaintiff's expert, introduced evidence that the standard medical practice in the community on January 24, 1968 would have required under the facts presented here that defendants immobilize the plaintiff's right hand so that he could not move his fingers or joints and advise him not to use the hand for any purpose and not to work. He further testified that upon receipt of Dr. Harper's x-ray report, such immobilization and non-work would be required to continue but now the medical standards in the community at that time would have additionally required that plaintiff be referred to an orthopedic specialist for consultation as soon as possible.

Prisoners at penal institutions have a right to receive the same medical attention supplied to the community generally. A prisoner pays his debt to society by serving his time in a penal institution and certainly no one expects such institutions to contain all the comforts of home. But a prisoner is entitled to walk out of prison on the day of his or her release with all of his or her physical and mental faculties intact and he or she should have the right to sue for damages if injury is caused by a physician's negligence while in prison.

The evidence in this case shows much more by way of omission than commission. The chronology of events as set forth in plaintiff's medical records while at Graterford are difficult to follow and at best present a spotty picture as to what procedures and advice were given to plaintiff after the January 30, 1968 x-ray report by Dr. Harper. Also the facts concerning when Dr. Andersen finally perceived that plaintiff's navicular bone in his right wrist was fractured are non existent. Also, the facts surrounding the referral to Dr. Hamburg for consultation are certainly unclear.

█ In all such negligence cases, and particularly in this case, the burden is on the defendant to come forward and explain how certain events took place upon the presentation by plaintiff of a prima facie case. Here plaintiff has made out a case of negligence against both Drs. Andersen and Place but not without difficulty. But as the record indicates, this is an unusual case in that the plaintiff was an inmate at Graterford Prison during the entire pendency of this suit. The medical records and witnesses were particularly difficult for plaintiff to obtain because of this obvious disadvantage. We are of the opinion that plaintiff did all he could in presenting his case to the Court under the handicaps of the situation.

## DAMAGES

█ Plaintiff Fear's navicular bone in his right wrist was fractured by the accident which took place on January 24, 1968. Such fracture, as the record indicates, has failed to unite properly because as we have found, the defendant doctors were negligent. This condition

is permanent and cannot be corrected by surgery.

Prior to his incarceration, plaintiff played the guitar professionally and was a member of the Baltimore musicians' union. Plaintiff was able to play for the sustained periods of time required of guitarists generally prior to his accident. Now, plaintiff's right wrist becomes stiff and painful if he plays his guitar for more than twenty minutes.

As was indicated by the testimony and the documents in evidence, plaintiff had attained a high level of proficiency as a mechanic at Graterford. Although there is no evidence which tends to show that plaintiff received formal mechanical training, plaintiff testified that he was earning approximately $30 to $32 per week as a Correctional Industries mechanic. Plaintiff further testified that he worked on large trucks as well as the Correctional Industries director's automobile. After he lost his job as Correctional Industries mechanic as the result of his having filed the suit in the instant case, plaintiff gradually worked his way up to a mechanic's position in the weave shop. Plaintiff received a citation or award while working in the weave shop for a mechanical innovation which he developed.

Because of his injury, plaintiff is not able to perform certain mechanical tasks. He cannot lift heavy truck tires nor can he perform many of the simple twisting or pushing jobs requiring the use of both hands. He has a 10 to 15 percent loss of motion in his right wrist and his wrist stiffens after prolonged work making him a hazard to himself and others in a garage situation.

Dr. Leshner testified that plaintiff could perform the tasks required of a low grade mechanic and that in such position, plaintiff could expect to earn approximately $6700 to $8000 a year. The same earnings for a journeyman mechanic would be approximately $12,000 to $15,000 per year so that plaintiff's minimum loss of earning power would be approximately $5000 per year. Actu-arial Leonard Goodfarb testified that a $5000 per year loss of earnings for plaintiff would result in a $99,935 loss of earnings for his work life expectancy reduced to present worth. Plaintiff's work life expectancy as a mechanic is 24 years. However, we think that because of his intelligence and experience, plaintiff will be able to obtain work as a higher grade mechanic or as a service manager thus reducing his damages for loss of earnings considerably. True he will not be able to perform certain tasks which we have previously enumerated, but he would not be required to perform such tasks if he were to be given a job as a service manager or mechanical consultant. We are of the opinion that $15,000 will compensate plaintiff for his loss of earning capacity in the future as a mechanic.

Likewise, we feel that the $18,842 representing plaintiff's loss of earnings as a guitar player for his work life expectancy reduced to present worth must be adjusted. Mr. Fear was no doubt a good guitar player in his day and did play professionally as he indicated. But music tastes have changed over the years, and we cannot say that Mr. Fear would be able to resume playing on weekends at the same rate he received as a union player or that the type of music he played in 1953 would be acceptable. In view of the above consideration, we are of the opinion that $3,000 will compensate plaintiff for his loss of future earning capacity as a guitar player.

We likewise award plaintiff $1,000 for pain and suffering and $1,000 for future medical costs for medication and orthopedic consultation. We view these amounts as reasonable under the facts of this particular case.

Any statements of fact or law found in this Court's discussion above which have not been specifically enumerated in the sections entitled "Findings of Fact" and "Conclusions of Law" respectively, are hereby designated "Supplemental Findings of Fact and Conclusions of Law."