**Grady D. KERSH et al., Plaintiffs,**

v.

**V. Lee BOUNDS, Commissioner of the North Carolina Department of Correction, et al., Defendants.**

**Civ. No. 2966.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 30, 1973.

Norman B. Smith and J. David James, Smith, Patterson, Follin & Curtis, Greensboro, N. C., for plaintiffs.

Jacob L. Safron, Asst. Atty. Gen., N. C. Dept. of Justice, Raleigh, N. C., James M. Bowen, Hamrick & Bowen, Rutherfordton, N. C., Harley B. Gaston, Jr., Belmont, N. C., Frank B. Aycock, III, Mraz, Aycock & Casstevens, Charlotte, N. C., for defendants.

## OPINION AND JUDGMENT

McMILLAN, District Judge.

Plaintiffs, three inmates of the North Carolina Department of Correction, seek damages and equitable relief from alleged cruel and unusual punishment and from alleged discrimination on the part of the defendants, officers and agents of the North Carolina Department of Correction, of Gaston County, and of Polk County, North Carolina.

Each of the three plaintiffs was convicted of a crime in a Superior Court. Plaintiff Kersh was convicted in Polk County; plaintiffs Price and Rogers were convicted in Gaston County.

In 1971, at the times relevant to this case, each of the plaintiffs was being held in Central Prison or some other unit of the Department of Correction as a "safekeeper." A "safekeeper" is a person who has been convicted of a crime in Superior Court (or in some instances who may be awaiting trial) and who is ordered by a judge to be transferred to the Central Prison or some other unit of the Department of Correction under the appropriate statutes (North Carolina General Statutes § 15–183 and § 153–189.1) in the interests of the safety of the prisoner or the safety of others.

Although if a conviction is affirmed on appeal the time spent in custody before final affirmance of the conviction does count as part of the sentence to be served, prisoners are not, while in this "safekeeping" status, considered to be "serving a sentence" with the North Carolina Department of Correction. Under G.S. § 153–189.1 the state provides their custody and maintenance but the counties pay for it. The average number of "safekeepers" in state custody at any time is about 140.

The average time served by a convicted felon in the North Carolina prison system is about four and one-half years; the average time served by a convicted misdemeanant is a little over ten months; the average period of time that a person remains in the prison system in a "safekeeping" status is about five months.

While in a "safekeeping" status the plaintiff Kersh was examined on May 5, 1971, and was found to have 20–25 vision but did not have any immediate need for eyeglasses (a re-examination some months later revealed that his vision was 20–20 and he did not need eyeglasses).

While plaintiff Max V. Rogers was considered to be a safekeeper he was found to be in need of corrective eyeglasses and false teeth (he apparently came to prison without either). He requested the Department of Correction and his "home" county of Gaston to supply him with corrective eyeglasses and false teeth and the requests were denied. These appliances would have been provided him if he had been a regular member of the prison population. In fact, after he became a member of the regular prison population he was fitted with dentures and eyeglasses in the fall of 1971.

While the plaintiff Jimmy A. Price was considered a safekeeper he was found to have a small umbilical hernia (a chronic loose inguinal ring). The Department of Correction declined to provide surgery to correct the hernia. (Some months later, after he became a member of the regular prison popula-

tion, he was re-examined and found in the opinion of the then examining doctors not to have a hernia.)

Under the administration of the medical program in the North Carolina Department of Correction, medical services for safekeepers are dispensed differently than for the rest of the prison population.

In order to insure that the counties which send safekeepers to the Department of Correction meet their financial responsibility under North Carolina General Statutes § 153–189.1, medical services to safekeepers are screened.

Those types of medical services designated as emergency or routine are administered without questioning the county's credit. However, those medical services designated as "elective" are not dispensed until the Department of Correction obtains notice that the county from which the safekeeper came accepts financial responsibility for these services.

The stipulated evidence shows that at least one of the plaintiffs (Rogers) requested medical services designated elective both from the Department of Correction and through them from the forwarding county. The services were not supplied. Defendants admit that the medical treatment sought would have been provided had he been confined as a prisoner within the regular prison population. No evidence was offered to show whether, if Rogers had remained in the county facility, these services would or would not have been provided.

■ Contrary to the suggestions of the Attorney General, courts do have the authority and the duty to require prison authorities to observe the guaranties of the federal Constitution in the operation of state prisons. It can well be said of North Carolina as it was said of Arkansas in Holt v. Sarver, 309 F.Supp. 362, 385 (E.D.Ark.1970), affirmed, 442 F.2d 304 (8th Cir. 1971):

"If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is counte-

nanced by the Constitution of the United States."

North Carolina has adopted and those in charge of the Central Prison administration appear to accept the duty to operate prisons within the limitations and under the requirements of the Constitution:

"A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945).

It is the duty of the court to decide the case, not upon the theory that jails are off-limits for the Constitution but upon the merits of the constitutional questions presented.

■ If an inmate of a jail or correctional institution is subjected to cruel, inhumane or other unconstitutional treatment, or if he is subjected to unlawful discrimination, the fact he may be a "short-timer" or has not fulfilled some residence requirement may not stay the hand of the court which is called upon to determine his constitutional rights.

The prison medical authorities diagnosed the plaintiffs' condition and reported that treatment was needed; and when they became journeymen prisoners, the treatment was in fact given. The issue is not the precise severity and nature of each medical need labelled "elective," but whether there is any justification for inmates being treated to different standards of medical care because these services are being paid for by different divisions of the state government. The stipulated facts are not developed sufficiently to show that Rogers' eyesight was so bad and lighting conditions of the prison were so poor that to deny him eyeglasses and thus the opportunity to read and write (which of necessity impinges on his right to communicate with counsel and court [see Worley v. Bounds, 355 F.Supp. 115 (W.D.N.C.

1973)], violates his right not to be subject to cruel and unusual punishment.

■ The practice of administering different standards of medical treatment inherently tends to promote the possibility of violation of the Eighth Amendment rights of individual inmates receiving medical treatment under the lower standard. However, on the record in this case the plaintiffs have not proved their allegations of cruel and unusual punishment. The case presents not a question of the constitutional adequacy of treatment of certain individual inmates, but the constitutionality of the policy and practice which maintains two different standards of treatment for prisoners.

The only justifications for the state's different medical treatment of safekeepers offered in oral argument are:

(1) The safekeeper's short time in the prison system makes it a nuisance to provide the same medical treatment provided to other prisoners.

(2) The safekeeper has to be on call to attend court.

(3) To provide the same medical treatment given all prisoners but safekeepers is an administrative inconvenience and produces an excessive amount of paperwork.

Point (1) is belied by the facts that safekeepers average over five months in the prison system and that the overwhelming majority remain in the prison system after their safekeeper status ends.

Point (2) has no force because the prison system is on call frequently to deliver prisoners to testify in criminal, habeas corpus, and other civil matters.

Point (3) is undermined by the fact that the average number of safekeepers is only one hundred and forty in a North Carolina Department of Correction prisoner population of several thousand. Any extra work involved is relatively marginal.

The weakness of all the suggested justifications for the discriminatory handling of the medical problems of safekeepers is finally demonstrated by the fact that when the county pays for the medical needs designated "elective," then the safekeeper is given the "elective" treatment just like any other prisoner.

■ The practice of treating prison inmates to two different standards of medical treatment merely because the bills of safekeepers are paid by the counties, whereas the bills of regular prison inmates are paid by the state, is a denial of equal protection of the laws as required by the Constitution.

The Fourteenth Amendment applies to the states, and a state may not escape its constitutional obligations simply by the manner in which it has created subdivisions or departments in order to provide public services. In fact, the United States Constitution does not even mention counties, cities, towns, county jails or state prisons; the probable existence of these entities is recognized by innuendo only, in the context of guaranties against cruel and unusual punishment, discriminatory treatment, due process of law and in other guaranties of civil rights and liberties.

There is no rational basis in giving prisoners different medical treatment just because the state has divided the responsibility of footing the bills among different governmental subdivisions. That a certain classification saves the state money has often been dismissed as a hindsight excuse insufficient to be a rational basis for an otherwise meaningless classification. Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); Shapiro v. Thompson, 394 U.S. 618, 632–633, 89 S.Ct. 1322, 22 L. Ed.2d 600 (1969). Here the classification is even more tenuous, being based purely on the accident of which state instrumentality pays the bill, and as such it is arbitrary and unreasonable.

The discrimination is also an unnecessary irritant in the correctional process; unequal or otherwise unfair treatment diminishes rather than increases respect

for organized society; the irrationality and unfairness of denying a prisoner certain medical treatment merely because there is some quarrel over which one of the state's pockets should provide the payment for this treatment impairs rehabilitation.

It is therefore ordered, adjudged and decreed, that the defendants discontinue the practice of treating safekeepers differently in any medical matter from other prisoners generally; that each plaintiff recover One Dollar ($1.00) as nominal damages; that defendants pay the costs of this action; and that since no actual damages to plaintiffs have been shown, no further relief is ordered, and the suit is hereby dismissed.