N. H. NEWMAN et al., Respondents-
Appellees,

v.

STATE OF ALABAMA and Bill Baxley,
Attorney General for the State of Ala-
bama, Petitioners-Appellants,

United States of America,
Amicus Curiae.

No. 73–2033.

United States Court of Appeals,
Fifth Circuit.

Nov. 8, 1974.

Rehearing and Rehearing En Banc
Denied Jan. 10, 1975.

William J. Baxley, Atty. Gen., Herbert H. Henry, George Beck, Thomas Sorrels, Asst. Attys. Gen., Montgomery, Ala., for petitioners-appellants.

Joseph Phelps, Phillip H. Butler, Montgomery, Ala., for respondents-appellees.

Michael S. Loftman, Civ. Rights, Dept. of Justice, Washington, D. C., Ira DeMent, U. S. Atty., Montgomery, Ala., J. Stanley Pottinger, Asst. Atty. Gen., Patricia G. Littlefield, Walter W. Barnett, Attys., Dept. of Justice, Civil Rights Div., Washington, D. C., amicus curiae.

Before GEWIN, THORNBERRY and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

This appeal emanates from a district court order, reported at 349 F.Supp. 278 (M.D.Ala.1972), sustaining a challenge to the quality of medical care dispensed to inmates incarcerated in the Alabama Penal System (APS). While laboring arduously and meticulously to implement the extensive relief mandated by the district court in the interim between that decree and oral argument before this court, appellants nevertheless raise numerous evidentiary objections, contest the finding of a constitutional violation as erroneous, and dispute the authority of a federal court in fashioning remedial relief to dictate medical standards which must be implemented.[1] Our en banc opinion in Sands v. Wainwright, 491 F.

1. Appellants also challenge the district court's award of attorneys' fees and expenses to appellees' court-appointed counsel. After oral argument to a panel of this court, the court sua sponte placed this case, Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 496 F.2d 1017 (5th Cir. 1974), and Gates v. Collier, 489 F.2d 298 (5th Cir. 1973) en banc for consideration. In the *San Antonio* case the only issue reserved by the court for en banc consideration was the is-

sue of awarding attorneys' fees in light of the Eleventh Amendment and Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Decision on the merits was retained by the original panel and was not placed before the court en banc for consideration. In Gates v. Collier there were two separate decrees of the district court, one on the merits, 349 F.Supp. 881 (N.D. Miss.1972), which has now been affirmed, 501 F.2d 1291 (5th Cir. 1974) ; the other decision of the district court dealing with

2d 417 (5th Cir. 1973), cert. denied, Guajardo v. Estelle, 416 U.S. 992, 94 S. Ct. 2403, 40 L.Ed.2d 771 (1974), prompted consideration, sua sponte, of whether the issues presented in this case were appropriate for disposition solely by a three judge court. Concluding that appellants' contentions cannot be sustained, and that the three judge court act, 28 U.S.C. § 2281, does not pose a jurisdictional impediment to the result obtained below, we affirm.

I

This class action litigation was initiated by the filing of a pro se complaint, designating the State of Alabama and various named individuals including the State Attorney General and the Warden of the Mt. Meigs Medical & Diagnostic Center (Mt. Meigs) as defendants.[2] The original complaint chronicled examples of patient neglect transpiring at Mt. Meigs, one of several institutions in the APS. After granting the request of the United States to appear as amicus curiae and appointing counsel to appear on Newman's behalf, the district court, in a pretrial order, extended the scope of the challenge registered from merely the shortcomings at Mt. Meigs to the inadequacies prevalent in the state system as a whole. In addition, it ordered further discovery procedures, pursuant to which a multitude of interrogatories and depositions were taken, and voluminous hospital records were subpoenaed. The

facts recounted in this opinion are distilled from the information produced by these procedures and the evidentiary hearing at which this information was admitted into evidence.

The APS contains 5 major prisons which house several thousand inmates: (1) Mt. Meigs with 331 prisoners; (2) Holman with 677 prisoners; (3) Atmore with 1,022 prisoners; (4) Draper with 867 prisoners; and (5) Julia Tutwiler with 117 female prisoners. Additionally, the state operates 13 prison road camps which house 737 prisoners, the state Cattle Ranch which houses 25 prisoners, and the Frank Lee Youth Correctional Center in which 73 prisoners are incarcerated. Each facility is beset by certain deficiencies, though to different degrees.

The most critical infirmity, from which no institution has escaped, is insufficient staffing. Although a paragon of quality when compared to the other institutions, Mt. Meigs, which serves as the central receiving unit and the general hospital and diagnostic center for the entire system, was staffed only by 2 physicians whose consolidated efforts replaced one full-time physician, 3 registered nurses, 8 medical technical assistants (M.T.A's), 1 lab and x-ray technician, and 1 pharmacist. It lacked a hospital administrator, a dietician, a medical records clerk, and a psychiatric consultant.[3] Moreover, because the registered nurses worked a standard week,

the issue of the award of attorneys' fees and expenses, 371 F.Supp. 1368 (N.D.Miss.1973), is now pending before the court en banc.

All issues in the case *sub judice* were placed before the court en banc by order of the court filed September 9, 1974. Counsel were afforded an opportunity to argue the merits, but it was conceded by all that the most disturbing issue in the case was the assessment of attorneys' fees and expenses in view of the decision in Edelman v. Jordan *supra*, and the provisions of the Eleventh Amendment. At oral argument en banc counsel did not argue the merits but limited their argument to the question of attorneys' fees and expenses. After submission of the case to the court en banc, the court on the 16th day of October 1974 amended its order of September 9, 1974 to reserve to the court

en banc only the question of the allowance of attorneys' fees and expenses. The appeal concerning the merits of the case was remanded to the original hearing panel composed of Judges Gewin, Thornberry and Simpson.

2. The complaint was filed on October 28, 1971. In a February 15, 1972 order, Judge Johnson granted Newman's motion to add as parties defendant the Alabama Board of Corrections, its Commissioner, its Chairman, and 4 members.

3. Mt. Meigs did employ a tuberculosis specialist and one surgeon, both of whom came to the facility once a week, and in addition, the surgeon was "available when needed." Mt. Meigs also had the services of a clinical psychologist for 1 afternoon per week, who

on the weekends and at night inmates would be attended only by M.T.A's and inmate assistants, neither of which are technically qualified medical personnel. The personnel shortages at the other institutions were more severe. Draper, for example, was staffed only by 1 M.T.A. and inmate assistants. A licensed practical nurse worked a dayshift at Tutwiler. Atmore was serviced by 3 M.T.A's, a part-time dentist, and a contract physician who conducted sick call 5 days a week. Holman was similarly staffed by 3 M.T.A's unavailable on weekends, a part-time dentist and a contract physician who made 3 visits per week for two hours at a time. Neither the road camps, the Cattle Ranch, nor the Youth Correctional Center was staffed by any medical personnel.

The deleterious consequences predictably occasioned by these shortages can be summarized as follows. First, it is necessary that unsupervised inmate assistants administer treatment and medication, take x-rays, give injections, and perform suturing and minor surgery on patients. Second, medical records are incomplete, inaccurate and not standardized. Third, and in conjunction with the latter deficiency, lines of therapeutic responsibility, if any exist, are poorly organized with the result that both doctors and their subordinates are often unaware of their responsibilities with respect to particular patients.[4] Finally, emergency patients at Mt. Meigs are, as the medical records of several inmates reveal, left unattended for protracted periods of time.

Beyond staff deficiencies, the institutions suffer from unsanitary conditions. For example, although Mt. Meigs contains separate wards for tuberculosis and hepatitis patients, soiled linens and dishware from these wards are cleansed in the same area as the linens and dishware of the general ward population, a fact which heightens the potential for contagion. At one of the institutions, a whirlpool was discontinued due to a "lack of adequate material to clean [the] pool for staph infection." Moreover, the physical plants of some of the facilities, particularly Draper and Julia Tutwiler, were in such a state of disrepair that sanitary conditions were jeopardized.

Assessments of the quality and quantity of medical supplies varied from institution to institution. For example, Dr. Joseph Alderete, the Hospital Director for the U. S. Penitentiary Hospital in Atlanta, Georgia, who conducted a survey of medical care in the APS, maintained that the drug supply at Mt. Meigs was adequate although some of the drugs administered were obsolete. At other institutions, chronic shortages were claimed to exist. Moreover, one institution was known to have employed rags and towels in lieu of gauze, the supply of which had been depleted.

The institutions generally also suffered from the existence of either ill-serviced or anachronistic equipment and medical procedures. For example, Tutwiler, the women's institution, employed drip ether as an anesthetic in delivery operations, despite estimates that this method had not been used after

devoted a comparable amount of time to Draper and Tutwiler.

The staffing shortages could have been mitigated if the legislature had authorized a larger budget beginning with fiscal year 1971. At the evidentiary hearing, John Braddy, the Correctional Plans Coordinator and Personnel Officer for the Board of Corrections, testified that the Board had created 14 positions throughout the APS which had remained vacant as a result of inadequate funding. Ten of these vacancies were for M.T.A.'s, 3 for doctors, and one for a clinical psychologist, all to be utilized throughout the system.

4. The consequences of inadequate medical records are manifest in two ways. First, because inmates transferred to and released from Mt. Meigs are accompanied by paltry records, personnel at the receiving institutions are unaware of the diagnosis, treatment previously rendered, and the treatment prescribed for the future. Second, there can be little or no monitoring of whether receiving facilities are complying with a physician's orders. Indeed, the evidence indicates that such noncompliance is rampant.

1953. Dental equipment at several of the facilities was generally characterized as outmoded. Moreover, witnesses related instances of x-ray machines that were not monitored for leakage and hence were potential sources of radiation exposure.

Witnesses identified numerous other foibles, including the absence of ambulances at the institutions, the lack of established procedures for fire emergencies, the existence of interminable delays in effecting medical referrals to Mt. Meigs and, in individual cases, in filling requests for eyeglasses and prosthetic devices, and the inadequacy of facilities for geriatric inmates.

Finally, despite an estimate by Dr. Mracek, Medical Director of the Board of Corrections, that approximately one-third of the inmate population suffers from mental retardation, and an assessment by Dr. Alderete that 60 percent of the inmates are disturbed enough to require treatment, the APS provides only nominal assistance to mentally ill inmates. At the time this suit was filed, the Board of Corrections employed one clinical psychologist who devoted one afternoon per week to disturbed inmates at Mt. Meigs and spent an equally limited amount of time at Draper and Tutwiler. No psychiatrists, social workers or counsellors were employed in the system. Additionally, obstreperous inmates were often placed in the general population and when finally removed, were left unattended in lockup cells not equipped with restraints.

The record is replete with examples of inmates upon whom untold suffering was visited as a result of these deficiencies.[5] These examples provide graphic testimony to the cumulative shortcomings which beset the APS. One inmate, a quadriplegic suffering from a maggot infested wound because of unchanged dressings, was forced to endure approximately 20 additional days after the problem was identified before the wound was cleaned and the dressings changed. Another patient, a geriatric rendered partially incontinent by a stroke, was required to sit day after day on a wooden bench beside his bed so that the bed would be kept clean. He reportedly fell from the bench and his legs, one of which was subsequently amputated, became blue and swollen. He died one day after the amputation. Because of the unavailability of a surgeon to attend an inmate who had sustained a serious head injury, a doctor was forced to employ towels and clamps to remove the inmate's skull from his brain. One inmate, transferred to Mt. Meigs as an emergency case, was not seen by a doctor until after a lapse of two days. The record contains numerous other examples of inmates who were discharged from facilities as cured or who were dismissed as malingerers, and yet were subsequently discovered to be suffering from an infectious malady or a terminal disease.

5. The Report of the Survey Team of the Medical Association of the State of Alabama, filed on January 4, 1973, confirms the appraisal rendered by Dr. Alderete and buttresses the district court's conclusion that the quality of medical care in the APS is inadequate. The report disparages the indiscriminate use of inmate assistants at Draper and characterizes the physical facilities at Holman, Atmore, and Draper as "grossly deficient." The Survey Team offered the following additional observations:

"(1) Cleanliness of the physical facility and of the prisoner's person is imperative but often lacking.

(2) Diet for prisoners is generally substandard; but specifically special diets for sick prisoners are almost non-existent.

Food, adequately prepared is, we believe, a great potential contributor to the health of prisoners as well as to their rehabilitation.

(3) There is gross deficiency of isolation facilities for communicable disease within the Prison System.

(4) There is a lack of such preventive procedures as, for instance, an effective immunization program.

(5) The dental care of the prison is quantitatively deficient, although apparently qualitatively good in some areas.

(6) The eye care is at a very low ebb and should be immediately improved, including provision of spectacles and treatment of correctable defects of the eyes."

The district court found that the pitfalls inhering in the quality of medical care afforded inmates of the APS transgressed the interdictions of the cruel and unusual punishment clause of the eighth amendment. The ameliorative decree ordered that extensive relief be undertaken. In addition to enjoining the APS from, *inter alia*, failing to formulate plans detailing emergency evacuation procedures and sanitation measures to be implemented, failing to provide drugs, eyeglasses and prosthetic devices to inmates in need, and failing to place geriatric inmates in separate uncrowded quarters, the district court ordered the APS to take the following measures: (1) elevate the Mt. Meigs Medical & Diagnostic Center to a quality comparable to that envisioned in the United States Department of Health, Education & Welfare Proposed Revised Regulations for Participation of Hospitals in Medicare Programs; (2) formulate within 90 days a plan detailing the nature and extent of care to be provided at each infirmary facility, including the evaluation and modernization of equipment and medical techniques; (3) conduct a survey of staffing needs and file proposed minimum staffing requirements for each of the institutions; (4)

adopt procedures which would facilitate the expeditious administration of treatment to emergency patients and inmates referred to Mt. Meigs, (5) circumscribe the functions unlicensed personnel could perform; and (6) ensure that needed medical care be provided to any afflicted inmate.

## II

■ Although not raised by the parties below or in their briefs on appeal, this court, sua sponte, requested opposing counsel to address the issue of whether a three judge court should have been convened to adjudicate the merits of Newman's claims.[6] Since this issue is jurisdictional, we are required to consider it, despite the failure of the parties to introduce it at any previous stage in the litigation. *See* Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452, 460 (1974); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 153, 83 S.Ct. 554, 9 L.Ed.2d 644, 652 (1963); Sands v. Wainwright, 491 F.2d 417, 424 (5th Cir. 1973); Johnson v. Netterville, 488 F.2d 394, 395–396 (5th Cir. 1974).

■ The relevant portion of the three judge court act, 28 U.S.C. § 2281,[7] stip-

---

6. Neither the court below nor the parties had the benefit of our decision in Sands v. Wainwright, 491 F.2d 417 (5th Cir. 1973), cert. denied, Guajardo v. Estelle, 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974), until after the appeal to this court was perfected. In view of the number of cases involving comparable challenges where the propriety of convening a three judge court was not even addressed, it is understandable that the issue was not briefed until *Sands* was decided. *See* Novak v. Beto, 453 F.2d 661 (5th Cir. 1971) (challenge to conditions of administrative and solitary confinement, including hygiene, medical care, diet, and cell conditions, in Texas Department of Corrections); Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971), aff'g, 309 F.Supp. 362 (E.D. Ark.1970) (challenge to racial segregation, forced uncompensated farm labor, trusty system, barracks system, absence of rehabilitative programs, and various conditions of confinement in Arkansas state penitentiary); Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968) (challenge to resort to whipping as a

disciplinary measure in Arkansas state penitentiary); Ross v. Bounds, 373 F.Supp. 450 (E.D.N.C.1974) (challenge to failure of North Carolina Department of Corrections to routinely examine black inmates for sickle cell anemia); Landman v. Royster, 333 F. Supp. 621 (S.D.Va.1971) (challenge to various disciplinary measures, including use of bread and water diet, restraining misbehaving inmates with chains and handcuffs in his cell, stripping an inmate and leaving him in unheated cell in solitary confinement, crowding inmates into single solitary cells, in Virginia state penitentiary). *See also* Kersh v. Bounds, 364 F.Supp. 590 (W.D.N.C.1973); Talley v. Stephens, 247 F.Supp. 683 (E.D. Ark.1965).

7. The full text of 28 U.S.C. § 2281 is as follows:
"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such

ulates that a court of three judges must be convened when an injunction is sought against "enforcement or execution of such [state] statute or of an order made by an administrative board or commission acting under State statutes, . . ." Appellants point to two statutes which authorize the Alabama Board of Corrections to promulgate rules and regulations concerning the sanitation, health and hygiene of the general inmate population, and concerning inmates for whom long term medical confinement is necessary, *see* Code of Alabama, tit. 45, §§ 3, 4 (1959),[8] as support for the conclusion that as in Sands v. Wainwright, *supra*, the state-wide practices under attack must be evaluated by a three judge court. This position, however, has only superficial appeal, and consequently we reject it.

In Sands v. Wainwright, *supra*, the en banc court considered whether challenges to various prison practices, registered in four consolidated cases,[9] were amenable to three judge court jurisdiction. In one of these cases, Baker v. Estelle, petitioners attacked two practices of the Texas Department of Corrections (TDC). Under the first, inmates claimed to have been subjected to solitary confinement and loss of good time without requisite due process guarantees, and under the second, prisoners attacked the TDC practice of reading and censoring attorney-inmate correspondence as transgressing the first amendment. Neither the 1953 TDC regulations nor those adopted in 1973 subsequent to the filing of the complaint condoned the specific practices deemed

objectionable by Baker. Indeed, he vigorously contended that because of this fact, resort to a three judge court was unwarranted. This court concluded, however, that in the context before it, the distinction between practices and regulations was artificial. The incisive reasoning undergirding this conclusion was articulated by Judge Goldberg as follows:

> "The 'practices' whose enforcement the inmates seek to enjoin are, in reality, the Rules and Regulations of the Texas Department of Corrections, *as applied*. Plaintiffs claim that no particular paragraph or section of those Rules and Regulations—either the 1953 version in effect at the time this litigation was initiated, or the July 9, 1973, version currently in effect—is constitutionally offensive, and that no injunction is sought against any such paragraph or section. *The entire thrust of plaintiffs' argument, however, is that the Rules and Regulations, as a whole and as applied, are constitutionally deficient standing alone. More complete and more specific regulations must be mandated in order to assure that the present 'practices' will not be continued.*" (Emphasis added)

491 F.2d at 428. Thus, the import of our disposition of the claims presented by Baker is that the complaint's failure to explicitly challenge the constitutionality of a specific regulation will not vitiate the need to convene a three judge court, where the relief sought, if granted, would inexorably condemn those promulgated rules and regulations not spe-

---

8. The specific language cited by appellants from section 3, delegates the following functions to the Department of Corrections: "To promulgate such rules and regulations

statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

necessary to hygiene, sanitation, cleanliness, healthfulness, feeding of prisoners, management and security of all prisons and jails." Section 4 delegates to the Board the authority to govern treatment of tubercular patients and other inmates needing long term hospital detention.

9. The companion cases to Sands v. Wainwright are Baker v. Estelle, Guajardo v. Estelle, and Guajardo v. McAdams. All are reported at 491 F.2d 417 (5th Cir. 1973) (en banc).

cifically challenged. Adoption of the contrary view would have been tantamount to sanctioning the resort to semantical and legal artifices, a practice which should be steadfastly abjured.

Contrary to appellants' contention, however, the challenges levelled in this case are fundamentally different from those orchestrated in Baker v. Estelle, and hence the reasoning enunciated therein is inapposite here. Initially, we apprehend a salient qualitative distinction between the pre-punitive confinement disciplinary procedures and mail censorship practices attacked in Baker v. Estelle and the calibre of medical care attacked by inmates of the APS. The practices in Baker v. Estelle had in fact been ordained by the TDC, and, as witnessed by the regulations on administrative confinement at issue in Guajardo v. McAdams, one of the four consolidated cases, were amenable to codification in regulation form. In contrast, the APS is not governed by any uniform practice or procedure in the administration of medical care, beyond the purported uniform practices of neglectful treatment dispensed at the various prison locations throughout the state. Moreover, it is sheer sophistry to suppose that the Alabama Board of Corrections would undertake, for example, to prescribe statewide the supply of gauze and drugs available to inmates, or the hours during which licensed medical personnel would be available to render treatment, or to mandate the inordinate delays to which emergency patients would be subjected. In this respect, the medical conditions were not susceptible to codification in the form of regulations.

A second difference between the case before us and that presented in Baker v. Estelle, is that here, unlike *Baker*, a decision granting the requested relief will not eviscerate any regulations governing medical care in the APS. Beyond the aforementioned Alabama statutes, which are only of remote significance, no codified statute or regulation will be affected by this litigation.

■ A final distinction, which underscores the sanctity of the regulations or statutes which must be passed upon by a court of three judges, flows from the axiom that three judge court status is to be determined from allegations appearing on the face of a complaint. And this axiom, in turn, presupposes that the existence *vel non* of a uniform statewide practice is likewise ascertainable from the pleading stages of the litigation. Thus, in Sands v. Wainwright, *supra*, and the three companion cases, the state conceded that the practices complained of were of state-wide effect and only disagreed with the assertions of constitutional infirmity.[10] In the case before us, the state not only questions the con-

10. We acknowledge that the "face of the complaint" rule is not an intractable one, and that this rule may accede to the "jurisdictional command of § 2281." *See* Sands v. Wainwright, *supra*, 481 F.2d at 429. Thus, in Guajardo v. Estelle, the district court had recessed proceedings involving a dispute as to the propriety of censoring inmate mail, in order to enable the director of the TDC to present revised regulations to the court. After submission, the court resumed the proceedings, ultimately handing down a decree the effect of which was to modify 8 of the revised 1972 Rules and to strike 4 others. Unlike here, however, the censorship practices challenged in Guajardo v. Estelle were standardized. The retreat in *Guajardo* from the "face of the complaint" rule, being effected merely to enable the TDC to modify its previous procedures, is quite different from the retreat which would be effected by our sustaining appellants' position here. The merits of the censorship issue have been disposed of in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), disposes of the due process questions raised in the consolidated cases.

This final distinction is supported by our decisions in Morrow v. Crisler, 491 F.2d 1053 (5th Cir. 1974) and NAACP v. Allen, 493 F.2d 614 (5th Cir. 1974). These two cases involved challenges to discriminatory hiring practices of the Mississippi and Alabama Highway Patrols. There, as in this case, however, the existence *vel non* of a uniform hiring practice was hotly contested, and could be established not on the face of the complaint, but by resort to lengthy evidentiary hearings.

stitutional significance of medical conditions alleged to pervade the APS, but also contests whether in fact any uniform practice exists.

The decision in Sands v. Wainwright, *supra,* comported with what we characterized as a proclivity for a broad interpretation of the language " 'State statute . . . or . . . order made by an administrative board or commission acting under State statutes.' " 491 F.2d at 423. To countenance the application of *Sands* to the instant case would work an unprecedented expansion of the jurisdiction of three judge courts and would erode the customarily constrictive view of three judge court jurisdiction which the Supreme Court has mandated. *See* Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577, 591 (1974); Bd. of Regents v. New Left Education Project, 404 U.S. 541, 545, 92 S.Ct. 652, 30 L.Ed.2d 697, 702 (1972); Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800, 805 (1941). Accordingly, we conclude that this litigation was appropriately disposed of by a single judge district court.

### III

In addition to challenging the district court's conclusion that the quality of medical care violated the eighth amendment, appellants assign as error numerous evidentiary rulings rendered below.[11]

We have examined these rulings and find them to be compatible with F.R. Civ.Pro. 43(a) [12] and the broad discretion extended in an equitable proceeding to a judge acting in his capacity as chancellor. *Compare* Castilleja v. Southern Pacific Co., 445 F.2d 183, 186 (5th Cir. 1971), *and* Butler v. Southern Pacific Co., 431 F.2d 77, 79 (5th Cir. 1970), cert. denied, 401 U.S. 975, 91 S. Ct. 1196, 28 L.Ed.2d 325 (1971), *with* Dallas County v. Commercial Union Assurance Co., 286 F.2d 388, 394-395 (5th Cir. 1961). Hence, we proceed to consider whether the finding of a constitutional violation can be sustained.

As appellants vigorously maintain, and as the district court acknowledged, courts must be wary to avoid obtrusively monitoring the conduct of prison officials and thereby encumbering the administration of prison affairs. This court has been sedulously mindful of its circumscribed role, *see, e. g.,* Campbell v. Beto, 460 F.2d 765, 767 (5th Cir. 1972); Sinclair v. Henderson, 435 F.2d 125, 126 (5th Cir. 1970); Schack v. State of Florida, 391 F.2d 593, 594 (5th Cir.), cert. denied, 392 U.S. 916, 88 S.Ct. 2080, 20 L.Ed.2d 1376 (1968), and the foundation to which this role is pinioned. The underpinnings of judicial deference were recently articulated in Procunier v. Martinez, 416 U.S. 396, 94

---

11. The assigned evidentiary errors were as follows: (1) admitting Proposed Revisions of Regulations Covering Participation of Hospitals in Medicare, The Standards of the Joint Commission on Accreditation of Hospitals, and Standards of the Alabama Board of Health into evidence solely to the extent they reflect acceptable minimum standards for operation of a hospital; (2) admitting income tax returns of part-time prison physicians retained by APS into evidence for purpose of showing the distribution of sources of each physician's income; (3) admitting the expert medical testimony of Dr. Joseph Alderete as to the adequacy of treatment when such testimony was based on personal inspections, sworn answers to depositions, and hospital records; (4) attributing minor significance to a comparison between a field hospital in Atlanta and Mt. Meigs, because the facilities are not comparable;

(5) considering and admitting evidence of the absence of treatment for the mentally ill as germane to the issue of the adequacy of medical care, the latter of which alone was explicitly raised in the pro se complaint.

12. F.R.Civ.Pro. Rule 43(a) provides in relevant part that:

"All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. *In any case, the statute or rule which favors the reception of the evidence governs.* . . . " (Emphasis added)

S.Ct. 1800, 1807, 40 L.Ed.2d 224, 235 (1974) by Mr. Justice Powell:

"Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree."

■ At the same time, however, this court has been cognizant of the fact that deference which shields officials engaging in intemperate action and which excuses judicial myopia is incompatible with our role as arbiters of the Constitution [13] and hence cannot be countenanced. Thus, while obedient to our limited function in passing upon prison complaints, we have not been impervious to the need to fetter prison officials where constraints are constitutionally appropriate. For example, in Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968), we remonstrated that once an individual is incarcerated, "any further restraints or deprivations in excess of that inherent in the sentence and in the nor-

mal structure of prison life should be subject to judicial scrutiny." And we amplified these concerns in Campbell v. Beto, 460 F.2d 765, 768 (5th Cir. 1972) observing that:

"Whatever may be the outer contours of the 'prison discipline rule', it is apparent that the courts cannot close their judicial eyes to prison conditions which present a grave and immediate threat to health or physical well being . . . . If 'the deprivation of basic elements of hygiene' has consistently been held violative of constitutional guarantees . . ., then certainly practices which result in the deprivation of basic elements of adequate medical treatment, particularly such deprivation as immediately threatens life and limb, would be equally vulnerable." (citations omitted).

Underlying the reasoning articulated in these two cases is the conviction that deference should be tendered only as to these necessary or essential concomitants of incarceration, see Sinclair v. Henderson, 435 F.2d 125, 126 (5th Cir. 1970); Edwards v. Duncan, 355 F.2d 993, 994 (4th Cir. 1966); Newkirk v. Butler, 364 F.Supp. 497, 501 (S.D.N.Y. 1973). While limited mobility, for example, may be endemic to confinement, forcing inmates to endure severe infirmities without treatment for the duration of confinement is not. In conjunction with this reasoning, there has been a proliferation of decisions in which the fact that incarceration disables an inmate from procuring aid and creates total dependency upon the state for treatment has been seized upon as a justification for judicial scrutiny of prison medical practices. E. g., Fitzke v. Shappell, 468 F.2d 1072, 1076 (6th Cir. 1972); Mills v. Oliver, 367 F.Supp. 77,

---

13. The cases are legion which recognize that prisoners do not lose all their constitutional rights when they pass through the jailhouse door. See, e. g., Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Courtney v. Bishop, 409 F.2d 1185, 1187 (8th Cir. 1969); Jackson v. Bishop,

404 F.2d 571, 576 (8th Cir. 1968); Johnson v. Anderson, 370 F.Supp. 1373, 1379 (D. Del.1974); Diamond v. Thompson, 364 F. Supp. 659, 662 (M.D.Ala.1973); Collins v. Schoonfield, 344 F.Supp. 257, 264 (M.D.Md. 1972); Jones v. Wittenberg, 323 F.Supp. 93, 98 (N.D.Ohio 1971).

79 (E.D.Va.1973); Sawyer v. Sigler, 320 F.Supp. 690, 696 (D.Neb.1970); Ramsey v. Ciccone, 310 F.Supp. 600, 604–605 (W.D.Mo.1970); *cf.* United States ex rel. Fear v. Rundle, 364 F. Supp. 53, 61 (E.D.Pa.1973).

■ Of course, neither the diminished need to defer on matters of inmate medical care to judgments of prison officials nor the heightened need to vouchsafe the interests of inmates can attenuate the requisite showing of a constitutional infirmity which triggers judicial disapprobation. The district court concluded that medical conditions in the APS transgressed the eighth amendment's prohibition against cruel and unusual punishment. Numerous other courts have anchored their decisions to this provision. *See, e. g.,* Nelson v. Heyne, 491 F.2d 352, 354–356 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); Martinez v. Mancusi, 443 F.2d 921, 924 (2d Cir. 1970); Holt v. Sarver, 442 F.2d 304, 308 (8th Cir. 1971), aff'g, 309 F.Supp. 362, 372–373 (E.D.Ark.1970); Coppinger v. Townsend, 398 F.2d 392, 393 (10th Cir. 1968); Ramsey v. Ciccone,

*supra,* 310 F.Supp. at 605. An equally satisfactory constitutional repository is the due process clause. *See* Fitzke v. Shappell, *supra;* Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676, 688 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir. 1974). Under either of these rubrics,[14] however, the challenge to the district court's conclusions of law cannot be sustained.

As was noted, the most critical shortage in the APS is of qualified medical personnel. In Campbell v. Beto, *supra,* 460 F.2d at 769, we characterized as serious the allegation that the Texas Department of Corrections failed to provide a full-time doctor at the Wynn Unit and employed, instead, unlicensed individuals to diagnose ailments and prescribe medicines. *See also* United States ex rel. Fear v. Rundle, *supra,* 364 F.Supp. at 59; Gates v. Collier, 349 F. Supp. 881, 888, 894 (N.D.Miss.1972), aff'd, 501 F.2d 1291 (5th Cir. 1974). Clearly, under Campbell v. Beto, *supra,* the widespread use of inmate assistants and M.T.A.'s is suspect. Conversely, the limited availability of qualified personnel poses a problem of constitutional magnitude.

---

14. Various catch-phrases have been employed to demark the point at which judicial deference to prison officials on matters of medical treatment must accede. On occasion, this court has stated that officials are insulated from attack unless the facts reveal an abuse of discretion in failing to provide medical care. *See* Robinson v. Jordan, 494 F.2d 793, 794 (5th Cir. 1974); Schack v. State of Florida, *supra* 391 F.2d at 594. Those courts which acknowledge the existence of a right to medical treatment, subsumed within the due process guarantees of the fourteenth amendment, *see, e. g.,* Fitzke v. Shappell, *supra* 468 F.2d at 1076; cf. Blanks v. Cunningham, *infra* at 221; Mills v. Oliver, *supra,* 367 F.Supp. at 79; United States ex rel. Fear v. Rundle, *supra,* 364 F.Supp. at 61, are tolerant of some mishaps and require only that "under the totality of the circumstances, adequate medical treatment be administered when and where there is reason to believe it is needed." Mills v. Oliver, *supra,* 367 F.Supp. at 79. Under the cruel and unusual punishment clause of the eighth amendment, courts confine their inquiry *inter alia* to whether conditions of confinement

"shock the conscience," are greatly disproportionate to the offense, or offend evolving notions of decency. *See* Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630, 642 (1958); Robinson v. California, 370 U. S. 660, 677–678, 82 S.Ct. 1417, 8 L.Ed.2d 758, 769 (1962) (Douglas, J., concurring); O'Brien v. Moriarty, 489 F.2d 941, 944 (1st Cir. 1974); Novak v. Beto, 453 F.2d 661, 676 (5 Cir. 1971) (Tuttle, J., dissenting), rehearing denied, 456 F.2d 1303 (5th Cir. 1972); Holt v. Sarver, 309 F.Supp. 362, 372–373 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971). It appears that the reasoning employed in justifying judicial invalidation of prison practices is as mottled as the varied explications of the cruel and unusual punishment clause proffered in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We minimize the import of this diversity, however, in view of the catholicity of opinion that the requisite showing consists of evidence of rampant and not isolated deficiencies which due to callous indifference subject inmates to the severe deprivations chronicled in the record below.

The inexorable nonattention and delays in receiving treatment attributable to personnel shortages, the ill-conceived system for referrals of inmates to Mt. Meigs from other facilities, and the maladroitly operated "emergency" referral system also present grave constitutional problems. This court has repeatedly reversed dismissals of complaints alleging failure to treat or allowing a protracted period of time to elapse before rendering treatment. *See* Campbell v. Beto, *supra*, 460 F.2d at 767 (TDC's refusal to permit inmate to see a doctor until 13th day of confinement in segregated status); Hutchens v. State of Alabama, 466 F.2d 507, 508 (5th Cir. 1972) (allegation of present lack of medical attention and medication, which produces intolerable pain and shortens life expectancy); Hughes v. Noble, 295 F.2d 495 (5th Cir. 1961) (refusal to give needed attention or allow plaintiff to call a physician for 13 hours after he was jailed for driving his car into a ditch, as a result of which he sustained a broken neck). *See also* Fitzke v. Shappell, *supra*; Blanks v. Cunningham, 409 F.2d 220 (4th Cir. 1969); Riley v. Rhay, 407 F.2d 496 (9th Cir. 1969); Mills v. Oliver, *supra*, 367 F.Supp. at 79; Sawyer v. Sigler, *supra*, 320 F.Supp. at 695; Talley v. Stephens, 247 F.Supp. 683, 687 (E.D.Ark.1965); McCollum v. Mayfield, 130 F.Supp. 112, 114–115 (N.D.Cal. 1955). Certainly, if the infirmity—lack of attention—is of constitutional magnitude, then the deficiency which spawns the infirmity—lack of available personnel, and ill-conceived emergency and referral procedures—can also be deemed to be of constitutional import. Accordingly, the referral and emergency procedures presently employed cannot withstand scrutiny.

■ The record also revealed shortages in drug supplies, the unavailability of eyeglasses and prosthetic devices, and the employment of obsolete medical equipment and techniques. Courts will not tolerate serious shortages in medication. *See* Hutchens v. State of Alabama, supra, 466 F.2d at 508; Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970). *See also* Thomas v. Pate, 493 F.2d 151, 158 (7th Cir. 1974). Since equally severe harm can be occasioned by the unavailability of eyeglasses and the use of anachronistic and precarious medical techniques and equipment, we should not be any less prone to disparage these deficiencies.

A fourth debility under which the APS was found to labor was the presence of disorganized lines of therapeutic responsibility. An ineluctable by-product of this condition is that treatment prescribed by doctors is not administered by medical subordinates. Since the failure of prison officials to comply with doctors' orders has occasioned judicial disapprobation, *see* Martinez v. Mancusi, *supra*; Sawyer v. Sigler, *supra*, a medical organizational system pregnant with the possibility of noncompliance is similarly amenable to attack.

Finally, the record revealed glaring unhygienic conditions, including the potential for contagion caused by nonsegregated sanitary facilities for the Mt. Meigs general ward population and hepatitis and tuberculosis ward populations, and the facilities in a state of disrepair at Draper and Tutwiler. This court has scrutinized sanitary conditions of facilities and demonstrated its unwillingness to condone the use of such facilities which jeopardize the life or health of inmates. *See* Anderson v. Nosser, 456 F. 2d 835 (5th Cir. 1972) (en banc), aff'g in part and reversing in part, 438 F.2d 183 (5th Cir. 1971). *See also* Thomas v. Pate, *supra*; Wright v. McMann, 460 F. 2d 126, 131 (2d Cir. 1972); Gates v. Collier, *supra* 349 F.Supp. at 887, 894; Hamilton v. Schiro, 338 F.Supp. 1016 (E.D.La.1970); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966).

■ We acknowledge that the inquiries of this court and the court below have not been free from difficulty. The challenge registered herein is unprecedented in scope. It evokes an evaluation of systemic medical deficiencies. Courts are not as readily equipped to quantify

the suffering occasioned by pervasive shortcomings as they are to assess whether a particular inmate has been maltreated. Nevertheless, three factors coalesce, impelling us to conclude that the district court's findings of constitutional inadequacy were not infirm.

First, many of the shortcomings prevalent in the APS have been judicially acknowledged to raise the spectre of constitutional infirmity in cases brought by individual prisoners. Moreover, most of those deficiencies which have not been specifically addressed by other courts but which we deem egregious are causes of conditions which have been abjured. For example, in our view, the causes of non-treatment or delays in treatment should trigger disapproval as strident as that prompted by the fact of non-attention or delay. Second, the pitfalls identified are of such a nature as to render large-scale improvident treatment inevitable. The use of dangerously out-moded equipment and medical techniques threatens the welfare of every inmate upon whom such equipment and techniques are employed. Third, and in conjunction with the latter point, the record is replete with countless examples of inmates who were subjected to incalculable discomfort and pain as a result of the lack of medical care or inadequacy in the treatment administered. These examples fortify the conclusion that deficiencies were not isolated and bespeak of callous indifference to the welfare of inmate-patients. Moreover, these examples also belie any suggestion that suffering resulted merely from legitimate discrepancies of opinion as to the proper treatment to be rendered.

### IV

■ Despite laboring strenuously to comply with the district court's mandates, appellants nevertheless challenge the remedy it devised. The relief ordained, appellants claim, prescribes specific standards of medical care and thereby transgresses the principle that courts should not intrude into matters related to prison administration. But whatever force this argument has derives largely from its generality. For the existence of constitutional infirmities deprives the prison deference rule of its indomitably insulating nature and dictates that the rule yield to the remedial power of a court.

Moreover, far from being intrusive, the measures formulated leave virtually all initiative with the APS while being particularly well tailored to ameliorate the unconstitutional deficiencies acknowledged to exist. Certainly, those aspects of the decree which, for example, enjoin the APS from perpetrating further denials, from failing to file a fire emergency plan, and from failing to elevate sanitary conditions, etc., are not obtrusive or cumbersome. Indeed, it would appear that only 3 provisions of the decree envision pervasive, though necessary, changes. These provisions require (1) the submission of plans for improvement of each facility, (2) the submission of similar plans for staffing. at each facility, and (3) the elevation of Mt. Meigs to the standards enunciated in the Proposed Revised Regulations for Participation of Hospitals in Medicare. The former two requirements vest the APS with the initiative in the first instance. The latter requirement, though quite specific, was imposed only when appellants were remiss in submitting proposed standards requested by the court at the termination of the evidentiary hearing.

Moreover, we would note that there is a striking congruity between the relief ordered and various improvements which Dr. Mracek, Medical Director of the APS, desired to implement upon his assumption of duties. This congruity tends to belie the suggestion that the district court intemperately imposed its will upon prison administrators. And Dr. Mracek's merely modest success leaves us less than sanguine that salutary change could be effected without moderate judicial monitoring.

■ ■ Finally, it is axiomatic that the remedial power of a district court is

coterminous with the scope of the constitutional violation found to exist. Appellants' intractable affirmations of incredulity concerning the district court's findings cannot obscure the fact that the deficiencies in the APS are more than mere peccadillos and the quality of medical care conspicuously less than spartan. Consequently, no litany of the prison deference rule can vitiate the district court's duty to fashion a remedy commensurate in scope with that of the infirmities discerned. We conclude that the district court acted well within its province in adopting the measures with which the APS has, heretofore, laudably complied. *See* Holt v. Sarver, *supra*; Inmates of Suffolk County Jail v. Eisenstadt, *supra*, in which courts ordered that extensive steps be taken to rectify medical or hygienic deficiencies.

### V

To reiterate, we hold that Sands v. Wainwright, *supra*, does not compel the convening of a three judge court, that no evidentiary errors were committed below, and that the district court's finding of a constitutional violation can be sustained.

It is not without some trepidation that we uphold the finding of a constitutional violation. Officials in the APS are shackled by anachronistic equipment, inadequate staffing, and parsimonious funding, factors which render Sisyphean their task of insuring that adequate medical care is available to inmates.

 By the same token, however, we cannot be impervious to the precarious position of inmates who, though dependent solely on a prison for medical attention, find their pleas for aid unheeded. Deep-seated inmate frustrations can be exacerbated by a perceived callous indifference to their medical plight. The incidence of frustration thwarts the purported goal of rehabilitation, which itself has not been immune from attack, *see, e. g.*, Hearings Before Subcommittee No. 3 of the House Committee on the Judiciary, 92d Cong., 1st Sess. ser. 18, pt. 4, at 50 (1971) (testimony of Dr. Seymour Halleck); Kastenmeier & Eglit, Parole Release Decision-Making: Rehabilitation, Expertise, & the Demise of Mythology, 22 Am.U.L. Rev. 477, 496 (1973); Kaufman, Prison: The Judge's Dilemma, 168 N.Y.L.J. 4 (1972), and thereby jeopardizes the ability of inmates to assimilate into the population at large when ultimately released. While it is not our function to expect or demand alchemy of prison officials, it is our role to ensure that the plight of inmates is not constitutionally forsaken. Fidelity to this role commands that the judgment of the district court be affirmed as herein indicated. The Eleventh Amendment issue as to the award of attorneys' fees and expenses will be decided by the court en banc.

Affirmed in part.