525 F.2d 1239
 Michael V. COSTELLO, Plaintiff-Appellee,
v.
Louie L. WAINWRIGHT, Director, Division of Corrections,
Defendant-Appellant.
 No. 75--2392.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 15, 1976.
Rehearing En Banc Granted March 3, 1976. 528 F.2d 1381.
 
 Donna H. Stinson, Asst. Atty. Gen., Dept. of Legal Affairs, Civ. Div., Jerry Oxner, Chief Trial Counsel, Robert L. Shevin, Atty. Gen., Raymond W. Gearey, Atty. for Fla. Div. of Corrections, John A. Barley, Asst. Atty. Gen., Dept. of Legal Affairs, Civ. Div., Tallahassee, Fla., for defendant-appellant.
 Tobias Simon, Miami, Fla. (Court-appointed), for plaintiff-appellee.
 Brian K. Landsberg, William C. Graves, U.S. Dept. of Justice, Washington, D.C., for amicus curiae.
 Appeal from the United States District Court for the Middle District of Florida.
 Before BROWN, Chief Judge, TUTTLE and RONEY, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 This is an appeal from an Order and Preliminary Injunction entered on May 22, 1975 by the trial court, requiring the Director of the State's Division of Corrections to lower its inmate population to 'emergency capacity' within one year of the date of the Order, and to 'normal capacity' by December 1, 1976. The suit was instituted in February 1972 as a class action on behalf of all prisoners in Florida, and the district court designated the United States as amicus curiae in December 1972. The amended complaint ultimately filed in January 1973 alleged a constitutionally inadequate level of medical care caused by severe over-crowding of prison facilities, resulting in violation of the cruel and unusual punishment, due process and equal protection clauses of the Constitution. Plaintiffs sought injunctive relief to alleviate the conditions complained of.
 
 
 2
 An application for a preliminary injunction filed by plaintiffs on February 8, 1973 was denied without prejudice by the district court: 'on the basis that the defendant Director of the Division of Corrections, Louis L. Wainwright, had himself closed the prison system to additional inmates because of the danger to the health and lives of the inmates. (Emphasis added).' Renewal of that application was made a month later and was denied. However, soon thereafter the court appointed Dr. Kenneth B. Babcock:[1] (1) to serve in his professional medical capacity as expert special master of this Court (along with Doctor Joseph Alderete[2] and others) by organizing, directing and conducting a comprehensive health services survey of all correctional institutions and road camps maintained and operated by the Division of Corrections; (2) to report his findings to the Court on the entire spectrum of health care services rendered to the inmates in custody of the Division of Corrections; and to report, as a matter of professional medical expert opinion, those remedial measures, if any, which were medically necessary to insure a minimally necessary medical program and system of health care to the inmates committed to the custody of the Division of Corrections.
 
 
 3
 Following the acceptance of a pre-trial stipulation by the district court in January 1975, the plaintiffs filed their second Renewal of Application for Preliminary Injunction (seeking to close the state prisons to further entrants) in April 1975. After holding hearings in April and May for the purpose of considering this application, on May 22, 1975 the court entered its order denying defendant's motion for a three-judge court and granting plaintiffs' application for preliminary injunction.
 
 
 4
 On June 10, 1975, however, this Court granted appellants a temporary stay of the district court's May 22nd order, and directed the trial court to conduct further hearings 'to develop a record . . . on the question of the minimum timetable for accomplishing all parts of the order, assuming this Court affirms that order on the merits.' The Court of Appeals' order indicated this was being done because the appellate court was of the view that 'Florida's representations of impossibility are serious enough to warrant further fact-finding.' Consequently, on June 16 and 17, 1975 the district court conducted further hearings and on June 27, 1975, entered and certified to this Court its findings of fact and conclusions of law, essentially reaffirming its May 22nd order on the merits. That order in essence required the following staged reduction of the over-crowded conditions within:
 
 
 5
 90 days - 2,000 inmates over emergency capacity
150 days - 1,500 " " " "
210 days - 1,000 " " " "
270 days - 500 " " " "
365 days - 0 " " " "
December 1, 1976 - O inmates over normal capacity
 
 
 6
 It also provided that by June 11, 1975, no more than one inmate was to be confined to each one-man cell at the Reception and Medical Center and that each inmate was to be provided a bed.
 
 
 7
 On July 25th we granted appellants a stay of the district court's order pending disposition of this appeal.
 
 
 8
 Appellant Wainwright makes three arguments on appeal: (1) that the order and preliminary injunction at issue embody a determination of issues not the proper subject of disposition by a single judge, and that a three-judge court should have been empanelled; (2) that the trial court should have abstained from further consideration and final disposition of the issues raised in appellees' application for injunction filed on April 21, 1973; and (3) that the trial court's May 22nd order is not supported by substantial evidence.
 
 
 9
 I. NECESSITY OF A THREE--JUDGE COURT.
 
 
 10
 Appellant Wainwright's first contention on appeal is that 28 U.S.C. § 2281 required the empanelling of a three-judge court in this case. That statute provides as follows:
 
 
 11
 'An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.' (Emphasis added.)
 
 
 12
 Appellant's argument that § 2281 is applicable to the instant case rests upon the premise that the practical effect of the trial court's May 22nd order and preliminary injunction is to enjoin the provisions of a Florida statute which requires the Director of the Division of Corrections to accept, house, maintain and care for persons duly committed to the Division. Refusing to accept additional inmates and/or releasing a substantial number of them, appellants contend, would be the only way to comply with the district court's mandate to reduce the overall inmate population to the extent and within the time frame specified, in view of certain fiscal, time and physical limitations which exist; therefore, the effect of the trial court's order will inevitably be to enjoin the further operation of the State statute mentioned above.
 
 
 13
 It would, of course, be too facile an answer to this contention by the appellants to point to the literal language of the statute which requires the appointment of the three-judge court only if the injunctive order of the trial court is based 'upon the ground of the unconstitutionality of (a specific) statute.' In our case of Sands v. Wainwright, 491 F.2d 417 (5th Cir. 1973) this Court concluded that a § 2281 court was required where statewide practices, which in reality were the statewide rules and regulations of a state department of corrections as applied, were directly challenged as being unconstitutional. In Newman v. State of Alabama, 503 F.2d 1320 (5th Cir. 1974) this Court construed the Sands opinion as holding that 'the complaint's failure to explicitly challenge the constitutionality of a specific regulation will not vitiate the need to convene a three judge court, where the relief sought, if granted, would inexorably condemn those promulgated rules and regulations not specifically challenged. . . .'
 
 
 14
 The trial court's order requiring that by certain dates in the future the prison population of the State of Florida be reduced to a figure not in excess of the figure which the state itself had denominated 'emergency capacity'[3] after 365 days and exceeding its 'normal capacity' after December 1, 1976 clearly would not 'inexorably condemn' the statutes to which the state draws our attention. The Newman case affirmed a judgment of the District Court for the Middle District of Alabama which required substantial affirmative conduct in improving the medical facilities in the state prisons in Alabama. It would, it seems to us, be an extreme example of logomachy were we to attempt to distinguish the case now before us and Newman relative to the contention that a three-judge district court is required here. Neither the requirement that the defendant Wainwright receive all prisoners required by Florida statute to be sent to his custody nor that he keep them in his custody in accordance with the Florida statute is attacked by this litigation. What is attacked is the method and manner of keeping them. The trial court expressly pointed out that the injunctive order did not prevent the defendant from increasing the emergency capacity or the normal capacity of the Florida prison system during the period covered by the preliminary injunction. Thus, the way is wide open for the State of Florida to meet the requirements of the injunctive order without the defendant being given the Hobson's choice of complying with the state statute or complying with the Court's order.
 
 
 15
 Moreover, other agencies of the State of Florida are also in the position of ameliorating the overcrowding situation which is the sole basis for the preliminary injunction appealed from. We should not assume that, once a determination had been made by a competent court that the overcrowded conditions are violating the plaintiff's constitutional rights and that the only relief from such overcrowding is a reduction of the prison population, the state Parole and Probation Commission would not consider accelerating the rate of paroles in order to meet constitutional standards. Furthermore, it seems conceded by the defendant that one of the sections of the Florida statutes, F.S. § 944.29 provides that Wainwright's division 'may allow, in addition to time credits, an extra good time allowance for meritorious conduct or exceptional industry.' Also, § 945.091 authorizes releases '. . . for (other) compelling reason(s) consistent with the public interest(s) . . ..'
 
 
 16
 A further reason why a three-judge court would not be required in this case is that which is articulated in Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974). This reason, which was the basis for the rejection of the contention in Gates that a three-judge court was required, was stated by a quotation from Sands v. Wainwright, supra
 
 
 17
 "The rule that a three-judge court need not be convened when either the constitutional attack on the State statute or regulation is insubstantial, Ex Parte Poresky, 1933, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152, or the constitutional defense is frivolous, Bailey v. Patterson, 1962, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512.' Sands et al., supra, 491 F.2d at 422.'
 
 
 18
 Gates v. Collier, 501 F.2d 1291, 1296.
 
 
 19
 Speaking to the insubstantiality of the constitutional claims, we said in Gates:
 
 
 20
 'Just as the law became well-defined in the school desegregation suits, so progress the prisoner rights cases based on the conditions of inmate habitation and practices of prison administration. Apparently, the Governor of Mississippi, in recognition that Parchman was operated in such an unacceptable manner, chose to concede the unconstitutionality of the conditions and practices . ..
 
 
 21
 In conclusion, based on these decisions interpreting section 2281, we hold that, since the Governor of the State of Mississippi conceded the unconstitutionality of the practices and conditions at Parchman, no substantial constitutional question is in controversy in this case.'
 
 
 22
 It is true in this case that neither by stipulation finally approved by the court nor by other admission by the defendant was there an actual concession here that the overcrowding or health conditions exacerbated thereby deprived the plaintiffs of their constitutional rights. However, in the stipulation the defendant stipulated that a denial of minimal health standards would be a deprivation of the prisoners' constitutional rights; that the standards prescribed in the Babcock report would, if adopted, meet the minimal requirements; and, finally, that the present standards do not meet those prescribed in the Babcock report. Further, the stipulation conceded first, that the court 'could' establish proper standards, and in a different part, conceded that the court 'should' adopt proper standards. It was in this posture that the trial court held the hearings on the motion for preliminary injunction, during the course of which, and some five months after the concessions above mentioned, the motion was first made that the case be dismissed for lack of a three-judge court.
 
 
 23
 Thus, although the state officials withheld their concurrence in any statement that their conduct amounted to an unconstitutional deprivation of the prisoners' rights, they conceded all of the facts, which placed against the conceded constitutional standard, amounted to precisely the same thing.
 
 
 24
 In order that this matter of the insubstantiality of the claim that a three-judge court is required may be fully understood we think it necessary to quote from parts of a long and comprehensive stipulation which the parties entered into in January 1975 in order to show that the effect of such stipulation was to eliminate any question whether there existed any substantial constitutional issue.
 
 
 25
 Part IV of the stipulation is headed: 'THE COURT COULD ESTABLISH STANDARDS FOR ADEQUATE MEDICAL TREATMENT.' This part follows:
 
 
 26
 'The parties recognize that the Plaintiffs have a right to adequate medical treatment and care; that 'a deprivation of basic elements of adequate medical treatment' constitutes cruel and unusual punishment in violation of the 8th and 14th Amendments to the United States Constitution. Campbell v. Beto, 460 F.2d 765 (5th Cir. 1972). Despite increasing recognition of these broad principles, however, few courts have attempted to develop general criteria and specific standards of medical treatment and care that would be applicable to the entire prison system within a particular state; and that would staisfy (sic) minimum requirements for medical treatment. (Footnote omitted).
 
 
 27
 At one time it was assumed that judicial difficulties in determining and formulating manageable standards for health care might be insuperable. However, recent decisions in Newman v. Alabama, (503) F.2d (1320) (5th Cir. 11/8/74) and Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974) hold that it is not beyond the competence of the federal judiciary to fashion institution-wide standards of medical care and treatment.'
 
 
 28
 Part V of the stipulation is headed: 'STANDARDS FOR ADEQUATE MEDICAL TREATMENT SHOULD BE ESTABLISHED.' The stipulation then reads:
 
 
 29
 'The parties recognize that the due process clause requires that minimally adequate treatment be in fact provided. This in turn requires that such minimum standards of treatment be established.
 
 
 30
 The parties agree that the Plaintiffs are not receiving such medical treatment as would be required by guidelines based upon the Babcock Report for the availability of mental and physical health care and treatment.
 
 
 31
 The parties further recognize that the Babcock Commission Report as modified by the Response of the Division of Corrections describes necessary improvements to the delivery of medical services within the prison system which, if implemented. . . .'
 
 
 32
 The clear thrust of this stipulation is that the defendants concede that the constitutional requirements are not being met and will not be met until improvements of the kind recommended in the Babcock Committee Report are instituted. We consider that this truly eliminates any substantial constitutional issue from the case.
 
 
 33
 II. FAILURE OF THE TRIAL COURT TO ABSTAIN FROM DECIDING THE ISSUES RAISED IN THE APRIL 1975 APPLICATION FOR PRELIMINARY INJUNCTION.
 
 
 34
 Plaintiffs filed their first Application for Preliminary Injunction to close Florida's prisons to the entrance of any more inmates on February 8, 1973. On February 13th the district court denied this application without prejudice, expressly stating that it would retain jurisdiction over the issues raised in the litigation. On March 2, 1973, the plaintiffs renewed their application for an injunction, and in an order dated April 24, 1973, the court simply stated that the renewed application 'is hereby denied.'
 
 
 35
 In the interim between April 1973 and April 1975 (when the plaintiffs renewed their application for injunction a second time and finally succeeded in having the district court rule favorably on it on May 22, 1975), a mandamus action was filed in December 1974 against appellant Wainwright in a state circuit court. The suit, brought by certain Florida law enforcement officials, sought to enjoin Wainwright from refusing to accept any prisoner lawfully committed to Florida's prisons, and was filed as a result of Wainwright's having voluntarily closed the state's prisons for two brief periods since the commencement of the instant federal action.
 
 
 36
 Given the above chronology of events, what appellants have attempted to argue is that the district court's failure to state expressly that it was retaining jurisdiction of the issues in the case when it denied the renewed application for preliminary injunction in April 1973 effectively divested itself of further jurisdiction over those issues. Consequently, argue appellants, the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, as extended by the recent case of Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482, dictates that the district court in this case should have abstained from any further consideration of the issues before it pending resolution of the mandamus suit in state court.
 
 
 37
 This argument is flawed by the weakness of the argument made by appellants that 'had the Trial Court intended to continue to retain jurisdiction over said issues it would have so stated as it did in its Order of February 13, 1973.' Despite its April 1973 denial of the renewal of the application for preliminary injunction, the district court clearly retained jurisdiction over all aspects of the case. It had in fact appointed Dr. Babcock to make the study referred to above. The April 1973 order can in no way be read, as appellants have argued, as divesting the federal district court of jurisdiction of the case. As this Court stated in Canal Authority v. Callaway, 489 F.2d 567, 576 (1974) '(t)he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.' (Emphasis added.) Therefore, the rule announced by the Supreme Court in Taylor v. Taintor, 83 U.S. (16 Wall.) 366, 21 L.Ed. 287 (1873) is fully applicable:
 
 
 38
 'Where a state court and a court of the United States may each take jurisdiction, the tribunal which first gets it holds it to the exclusion of the other, until its duty is fully performed and the jurisdiction invoked is exhausted and this rule applies alike in both civil and criminal cases.' 83 U.S. at 370.
 
 
 39
 There is nothing in the Younger series of cases that requires a federal court to abstain from granting a preliminary injunction in a civil action merely because the litigants have raised a somewhat similar issue in state civil litigation long after the federal court has taken jurisdiction and has taken significant and substantial procedural steps. The principle announced in Huffman v. Pursue, Ltd., supra, has no application, because there was no pending criminal or civil action here when jurisdiction was acquired by the district court.
 
 
 40
 III. MERITS OF THE DISTRICT COURT'S MAY 22ND ORDER AND PRELIMINARY INJUNCTION.
 
 
 41
 Appellant's final argument on appeal is that the competnet substantial evidence before the district court was insufficient to support a finding of constitutional deprivations imposed on prisoners as a result of prison overcrowding. They could not seriously take issue with the finding of the trial court to the effect that 'the record in this case, at least for purposes of preliminary injunctive relief, indicates that the defendants have violated their affirmative duty to establish a medical care delivery system which is designed to meet the routine and emergency health care needs of the inmates committed to their custody.' (Citations omitted.) This is true despite the fact the defendants have contended, without proof as yet, that the gross systemic deficiencies in the delivery of adequate medical care noted by the Babcock Commission Report had been partially eliminated.
 
 
 42
 As has already been pointed out in the discussion of the need for a three-judge court we construe the stipulation signed by the parties in January 1975, a wholly praiseworthy procedure, virtually to concede the correctness of this finding of fact by the trial court. In the language already quoted we find the statement: 'The parties recognize that standards comparable to the Babcock Commission Report as modified by the Division of Corrections response need to be implemented.' (In the stipulation the word 'comparable' was underscored but we have added the underscoring to the words 'need to be implemented.') We also find the following stipulation: 'The parties further recognize that the Babcock Report as modified by the response of the Division of Corrections describes necessary improvements to the delivery of medical services within the prison system which, if implemented, would either: (a) create guidelines for adequate medical care (defendant's position); or, (b) be a major factor in meeting minimal constitutional standards (plaintiff's position). (Emphasis added.)
 
 
 43
 Clearly, here, then, the parties are stipulating that the changes in the Babcock Commission Report together with the response of the Division of Corrections (which accepted almost without reservation the Babcock Report) 'need to be implemented.' They then stipulated that 'if implemented' they would, according to the defendant's position, create the guidelines necessary for adequate medical care.
 
 
 44
 Further, the parties stipulated as follows: 'The parties agree that the plaintiffs are not receiving such medical treatment as would be required by guidelines based upon the Babcock Report for the availability of mental and physical health care and treatment.'
 
 
 45
 In light of these stipulations, it would seem to border on the frivolous if the defendant should contend that there is insufficient evidence that there is a constitutional deprivation of plaintiff's rights with respect to the provision of adequate health services in the institutions under their control.
 
 
 46
 We then look to see whether there is a record basis to support the trial court's further determination that: 'Furthermore, the evidence is clear that the systemic deficiencies in the delivery of adequate health care have been greatly exacerbated by extremely severe overcrowding that has resulted in an overall inmate population level in excess of 2500 above 'emergency' capacity. The testimony indicates a direct correlation between severe overcrowding and the deprivation of adequate health care on one hand and a positive relationship between severe overcrowding and violence and brutality on the other.'[4]
 
 
 47
 As to the correlation between overcrowding and the inadequate health care we think it important once more to note the stipulation of the parties. Under a heading entitled: 'CAPACITY OF FACILITIES' the stipulation provides as follows:
 
 
 48
 The parties recognize that the normal capacity of the existing prison system should be limited to 9,313 persons; that even using temporary facilities and operating under conditions of extreme emergency, the capacity of the existing system should not be stretched beyond 10,535; and nevertheless, the number of persons committed to the custody of the Division of Corrections, as of September 30, 1973, was 11,521 or 986 over emergency capacity; that because of the temporary cessation of intake . . . by reason of this overcrowding of inmates . . . there is a backlog in the 67 jails in Florida in excess of 300; and that an additional 600 inmates are expected within the next 90 days.
 
 
 49
 In brief, there is, in the custody of the Division of Corrections, 3,130 persons over normal capacity limitations and 1,908 persons over emergency capacity limitations.
 
 
 50
 The parties recognize that severe overcrowding may be injurious to the physical and the mental health of the plaintiffs and such overcrowding should be eliminated.'
 
 
 51
 Once it is stipulated by the defendants that severe overcrowding may be injurious to the physical and mental health of the plaintiffs, it would seem to take but little affirmative evidence reasonably to satisfy a finder of the facts that, coupled with the already existing deficiencies in the health systems of the institutions, largely evidenced by shortage of staff, the words of the stipulation should now read in the facts determined by the trial court: 'Severe overcrowding is injurious to the physical and the mental health of the plaintiffs and such overcrowding should be eliminated.'
 
 
 52
 Such evidence was amply present in this case. The defendants seem to take the position in their appeal that because the state conceded only that severe overcrowding may be injurious it was beyond the power of the trial court to find that such overcrowding is in fact injurious. Several expert witnesses testified to this precise point. The witnesses whose qualifications could scarcely be challenged repeatedly testified to the correlation. Dr. Babcock's testimony appears as follows:
 
 
 53
 'Q. So that we begin with an inadequate medical facility even for a normal population of a prison, do we not?
 
 
 54
 A. That's right.
 
 
 55
 Q. And overcrowding, simply dilutes the availability of medical plants, equipment and services to the newcomer as well as the old-timers?
 
 
 56
 A. That is right.'
 
 
 57
 Dr. Walls, one of Mr. Wainwright's employees at the reception center, testified as follows:
 
 
 58
 'Q. Well, if I may sum up then, Doctor, it is your professional opinion that the conditions, the overcrowding conditions at the reception center are such that they are detrimental to the physical and psychiatric well-being of the inmates there at the present time?
 
 
 59
 A. At this time.
 
 
 60
 Q. And that it's being aggravated by the continued acceptance of inmates at the reception center?
 
 
 61
 A. Yes, sir.
 
 
 62
 Q. And that if the inmates were . . . if the reception center were closed down to new inmates, it would at least to that extent assist you in your program?
 
 
 63
 A. Yes, sir, it definitely would.'
 
 
 64
 Moreover, it is important to note that overcrowding adversely affects other inmate conditions besides health care. The 1973 Florida Comprehensive Plan for the Criminal Justice System, Multiyear Component (prepared by the defendants) says at p. 3--173:
 
 
 65
 'Thus, the first most pressing problem is overcrowded institutions. The environment created by gross overcrowding induces a variety of dangerous conditions. Loss of control increases proportionally with population increase thus producing greater threat to the orderly management of the institutions and the surrounding communities. This condition promotes anonymity and emotional stress . . . Treatment becomes less personal, less flexible, less effective. Crowding people produces a pathology that gives rise to increased sexual perversions, emotional instability, social disruption, and extreme depression. The current overcrowding rate for all nine major institutions combined is 2,402 inmates over capacity. (April 1974)' (Emphasis in original).
 
 
 66
 The appellants contend that the trial court failed to observe the four prerequisites to the issuance of a preliminary injunction. To the contrary in footnote 13 of the order of May 22nd the trial court stated:
 
 
 67
 'The court is clearly of the opinion that the four prerequisites to the issuance of a preliminary injunction have been satisfied in that: (1) the plaintiffs have demonstrated that there is at least a substantial likelihood that they will prevail on the ultimate merits; (2) there is a substantial threat that the plaintiffs will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiffs far outweighs the threatened harm the injunction may do to the defendants; and (4) granting the preliminary injunction will not disserve the public interest but will in fact advance the public interest. Canal Authority v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974).'
 
 
 68
 We find that the evidence, taken together with the stipulations, fully justify the trial court's determination that the prerequisites to the issuance of a preliminary injunction had been satisfied in this case.
 
 
 69
 IV. THE REMEDY.
 
 
 70
 Following the granting of the preliminary injunction by the trial court the appellants moved in this Court for a stay pending appeal depending to some extent upon what they contended to be the impossibility of compliance with the trial court's order. An emergency panel of this Court entered an order which stated:
 
 
 71
 'While the district court has denied a stay of that order pending an appeal, we are of the view Florida's representations of impossibility are serious enough to warrant further fact finding. In particular, the district court is directed to conduct hearings to the end of determining Florida's capacity to carry out each term of the court's order. The district court should hold appropriate hearings to develop a record--and make findings of fact and conclusions of law--on the questions of the minimum time table for accomplishing all parts of the order, assuming this court affirms that order on the merits.'
 
 
 72
 The order of this Court further provided that the district court should certify to this Court its findings and conclusions with respect to each term of the order.
 
 
 73
 In response to this remand the district court conducted two days of further hearings on June 16 and 17 'addressed to the specific issue of the state's capacity to comply with the preliminary injunction.'
 
 
 74
 The court found that since its May 22nd order the actual population, including a backlog of inmates in county jails of the Florida prison system had increased so that there were 645 more inmates above the emergency capacity than had existed according to statistics on which the court had based its original order. The court found that the defendants had evaluated the requirements of the court's order in light of the anticipated inmate population and an increase in capacity of the prison system over the period covered by the order and that they had produced the following table comparing the court's order to capacity and population:
 
 
 75
 Needed Beds
 Emergency Court Projected To Confirm
 Date Capacity Order Population Court Order
-------- --------- ----------- ---------- -----------
 8/20/75 11,717 13,717 15,112 1,395
 (2,000 above emergency capacity)
10/14/75 12,117 13,617 15,712 2,095
 (1,500 above emergency capacity)
12/18/75 12,117 13,117 16,312 3,195
 (1,000 above emergency capacity)
 2/16/76 12,173 12,673 16,912 4,239
 (500 above emergency capacity)
 5/21/76 14,335 14,335 17,859 3,524
 (emergency capacity)
12/ 1/76 14,410 13,202 19,581 6,379
 (normal capacity)
 
 
 76
 The court further found: 'The Florida prison system will not have the emergency capacity to house the number of inmates, 15,112 it anticipates will be confined in the first stage of the court's order (August 20, 1975) at any time during the operative portion of the order. The Division of Corrections is not able to project when it will have that capacity. By December 1, 1976, when the court requires that the inmate population be no greater than the normal capacity of the prison system there will be 19,581 inmates confined or 6,379 inmates over the system's normal capacity.' The court made the further findings which are significant in response to this court's remand:
 
 
 77
 'In response to this Court's order of February 20, 1973, requiring the defendants to produce a plan to overcome overcrowding, the defendants suggested three major approaches in addition to their efforts to increase their capacity; early releases, controlled intake and parole and probation. In seeking to comply with this Court's order of May 22, 1975, the defendants have continued to adhere to rather than expand the arbitrarily established limit of a three-month early release. State law imposes no such limit. The defendants continue to operate under the Governor's instructions preventing them from reinstating the program of controlled intake and the Parole Commission has drastically reduced the number of inmates it releases.
 
 
 78
 The Division of Corrections, the Governor and the Parole Commission agreed upon a plan for short-term and extended relief for overcrowding through a reduction of inmate population by providing more supervision in the community. It was agreed that in addition to the historical monthly rate of paroles of 225 inmates the Parole Commission would establish a system of emergency parole. (Plaintiffs' Exhibit 63) The anticated relief of overcrowding through release was not realized. In the third and fourth quarters of fiscal year 1974--75, during which the Florida prison system experienced an unprecedented growth in its inmate population, the Parole Commission has substantially reduced the number of inmates it has released to figures well below its historical average of 225 inmates per month.
 
 
 79
 The defendants, in response to the Court's order of February 20, 1973, also reported on their efforts to increase the prison system's capacity. These efforts included the acquisition of surplus property, including an abandoned migrant labor camp and school building, the purchase of mobile homes and the leasing of a private home and motel. (Defendants' Response to the Court's order of February 20, 1973, pages 3--7) For various reasons, including anticipated adverse community reaction, these alternatives, previously employed with positive results, have not been fully evaluated. The purchase of additional mobile homes and the leasing of private and commercial facilities could assist the defendants in their efforts to comply with the Court's order.
 
 
 80
 The defendants cite the following major reasons for their stated inability to comply with the Court's order: constricted time frame, insufficient funds, operational constraints of state government, community resistance and continued population explosion. (Defendants' Exhibit O) With adequate funding approximately the level of funding requested by the Division of Corrections, the problem of overcrowding within the Florida prison system could be overcome. Community resistance results in the elimination of possible construction sites, the decision not to lease or acquire existing facilities or delays in construction.
 
 
 81
 As of July 1, 1976, the Division of Corrections will cease to exist. In accord with recent legislative action, a Department of Offender Rehabilitation will assume the responsibilities of the Division of Corrections. A major portion of the effort of this new department of state government during the coming fiscal year will be devoted to establishing itself and its internal and external working relationships. By necessity, the establishment of the new organization will detract from the capacity of the defendants to comply with the Court's order. Funds for the acquisition or construction of additional housing must await until reorganization is completed and the cost of the new department can be determined and funds can be released for that purpose. Such tasks as the drafting of job descriptions, creating a salary scale in conformity with other agencies, establishing and creating lines of communication and responsibility must be completed before the department's full resources can be directed toward the alleviation of the conditions of overcrowding within the Florida prison system.
 
 
 82
 The defendants, acting in the normal course of business and following methods found to be insufficient and inadequate in the past, have reached the conclusion that they cannot comply with this Court's order. Indeed, irrespective of the time requirements of the Court's order, the defendants are unable to determine when they will be able to house the number of inmates they expect in just two months and have no idea how they will be able to accommodate the number of inmates expected to be confined to the Florida prison system by the end of 1976.'
 
 
 83
 Following these fact findings the court then concluded as follows:
 
 
 84
 'This Court has found that 'overwhelming evidence points toward blatant deprivations of the plaintiffs' constitutional rights, which the State of Florida has been unwilling to rectify.' (Order, May 22, 1975, page 22) This Court has also found:
 
 
 85
 'that severe crisis overcrowding creates violence, brutality, disease, bitterness, and resentment as to both inmates and correctional staff. In addition, severe overcrowding in the prison system tends to perpetuate anti-social behavior and foster recidivism so as to ultimately disserve the rehabilitative goals of the correctional system.'
 
 
 86
 Order, May 22, 1975, page 29.
 
 
 87
 The defendants suggest that the price of overcrowding 'is ineffective programs at best and (not infrequently) destruction and loss of life at worst.' (emphasis added) Overcrowding in the Florida Prison System, Technical Assistance Report, American Justice Institute, page 6--7. Continued overcrowding above emergency levels and at an increased rate continues the massive deprivation of constitutional rights at an accelerated rate. The defendants, under their present planning, cannot advise the Court when, if ever, they can reduce or eliminate these deprivations of constitutional rights. Therefore, persons committed to the Florida prison system will be deprived of constitutional rights indefinitely.'
 
 
 88
 The trial court then restated its conclusions of law to the effect that the State of Florida, having chosen to operate a penitentiary system, must operate that system in accordance with the Constitution of the United States, citing Gates v. Collier, 501 F.2d 1291, 1319--1320 (5th Cir. 1974); further, that the district court having found deprivations of constitutional rights, including overcrowding, had the power, pursuant to its equitable authority to order that the inmate prison population of the Florida prison system be reduced, citing Newman v. Alabama, 503 F.2d 1320 (5th Cir. 1974) and Gates v. Collier, supra, at p. 1291; that the fact that the Florida State Legislature had provided funding for operation of the Florida prisons in less amounts than requested by the defendants is no excuse for the continued existence of unconstitutional conditions of incarceration, citing Wyatt v. Stickney, 344 F.Supp. 373, aff'd, 503 F.2d 1305, 1314--1315 (5th Cir. 1974) and Finney v. Arkansas, 505 F.2d 194, 301 (8th Cir. 1974).
 
 
 89
 We agree with the statement made by this Court in Gates, supra:
 
 
 90
 'Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts. In Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971), an installment of the Arkansas prison litigation, the district court stated:
 
 
 91
 'Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.' 309 F.Supp. at 385.' (Emphasis supplied.)
 
 
 92
 The contention that a decree of a federal court requiring compliance with constitutional standards cannot stand because it involves the expenditure of large sums of money is not new, but it has uniformly been answered in the manner stated by the court in Holt. In Wyatt v. Aderholt, we stated it in the following terms:
 
 
 93
 'We find these arguments unpersuasive. It goes without saying that state legislatures are ordinarily free to choose among various social services competing for legislative attention and state funds. But that does not mean that a state legislature is free, for budgetary or any other reasons, to provide a social service in a manner which will result in the denial of individuals' constitutional rights. And it is the essence of our holding, here and in Donaldson (Donaldson v. O'Connor, 5 Cir., 493 F.2d 507), that the provision of treatment to those the state has involuntarily confined in mental hospitals is necessary to make the state's actions in confining and continuing to confine those individuals constitutional. That being the case, the state may not fail to provide treatment for budgetary reasons alone. 'Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations'. Jackson v. Bishop, 8 Cir., 1968, 404 F.2d 571, 580 (Blackmun, J.), quoted, Rozecki v. Gaughan, 1 Cir. 1972, 459 F.2d 6, 8. 'Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights'. Hamilton v. Love, E.D.Ark.1972, 328 F.Supp. 1182, 1194. ' (T)he obligation of the Respondents (prison officials) to eliminate unconstitutionalities does not depend upon what the Legislatures may do'. Holt v. Sarver, E.D.Ark.1970, 309 F.Supp. 362, 385, aff'd, 8 Cir. 1971, 442 F.2d 304. See also Hawkins v. Town of Shaw, 5 Cir. 1971, 437 F.2d 1286, 1292.'
 
 
 94
 It is clear that there is nothing in the trial court's preliminary injunction that cannot be accomplished but for the lack of funds. Optimistically some remedial steps can be taken even without substantial additional expenditures. In any event, the right of the plaintiffs to be secure in their constitutional rights cannot be made dependent upon the action of the state legislature in appropriating additional money, an area which we can all recognize from the course of human experience is a field in which relief too often comes, too little and too late.
 
 
 95
 It should be borne in mind that what we are dealing with here is a preliminary injunction, subject to modification at any time by the trial court upon a proper showing by the defendants that such emergency or exceptional circumstances have arisen as to warrant the Court's giving further consideration to the terms of the injunction. Moreover, it should be borne in mind that well before the final date covered by the court's order, the case should be ripe for final adjudication, after which the court's final injunction, if warranted, will be issued, based upon the facts as they then exist.
 
 
 96
 In view of the fact that the injunctive order has been delayed by a stay issued by this Court, and it has therefore not become effective, the dates stated in the trial court's injunction shall be modified accordingly. That is to say, the periods 90 to 365 days referred to in the order, shall begin to run from the date of the remand of this Court's judgment in the trial court. Also, the date, December 1, 1976, shall be modified to July 1977.
 
 
 97
 As modified, the judgment of the trial court is affirmed and the stay heretofore granted is vacated effective upon the receipt by the trial court of the mandate.
 
 RONEY, Circuit Judge (dissenting):
 
 98
 The order in this case requires a result that the defendant cannot possibly achieve and still comply with the Florida law which limits his authority. I would vacate the order and remand the case to the district judge to decide precisely what the defendant in this suit can do to alleviate the constitutional violations found to exist and then to fashion an order with which this defendant can comply without violating any Florida laws. If a court order is to be entered which requires action of this defendant which will violate Florida laws, on the ground that to comply with the law is unconstitutional, then a three-judge court should be convened. If a court order is to require action of other state officers and agencies, they should be made parties.
 
 
 99
 The district court and the majority opinion have overlooked a very basic reality about this case. The State of Florida is not a defendant. The Parole and Probation Commission is not a defendant. The Governor is not a defendant. Nor are any of the 'other agencies of the State of Florida' parties to this suit, agencies which the majority opinion says 'are also in a position of ameliorating the overcrowding situation which is the sole basis for the preliminary injunction appealed from.' True as it may be that 'the way is wide open for the State of Florida to meet the requirements of the injunctive order,' as the majority states, the State of Florida is not enjoined. There is nothing in this record to indicate that the defendant Wainwright, who is the only party who can be held in contempt for noncompliance, has any way to legally meet the broad scope of the order. He is bound by Florida law, with the compelling force of criminal sanction, to accept all prisoners brought to him. See Fla.Stat. §§ 839.21; 944.16; 945.09. Moreover, he is severely restricted on what he can do to discharge the prisoners. See Fla.Stat. § 944.29. Although he has ability to provide some additional prisoner capacity, that ability is limited. This suit was brought as a prison health case. Certain relief may be appropriate againstWainwright. But when the action turned into a prison overcrowding case, it stretched beyond the legal limitations of this defendant's authority.
 
 
 100
 Here the only practical way that defendant Wainwright can comply with the ordered relief is to forego his statutory responsibility of accepting and keeping lawfully committed prisoners. Those statutes, if complied with by defendant, absent any action by persons not parties to this lawsuit, will work to deprive plaintiffs of constitutional rights. The statute becomes unconstitutional in operation. A statute does not have to be directly challenged as unconstitutional on its face where the impact of a court order achieves the precise result requiring a three-judge court. See Query v. United States, 316 U.S. 486, 489, 62 S.Ct. 1122, 86 L.Ed. 1616 (1942); C. Wright, Law of Federal Courts § 50, at 190 (2nd ed. 1970). As Judge Gewin stated in commenting on Baker v. Estelle, 491 F.2d 417 (5th Cir. 1973):
 
 
 101
 Thus, the import of our disposition of the claims presented by Baker is that the complaint's failure to explicitly challenge the constitutionality of a specific regulation will not vitiate the need to convene a three judge court, where the relief sought, if granted, would inexorably condemn those promulgated rules and regulations not specifically challenged. Adoption of the contrary view would have been tantamount to sanctioning the resort to semantical and legal artifices, a practice which should be steadfastly abjured.
 
 
 102
 Newman v. Alabama, 503 F.2d 1320, 1326--1327 (5th Cir. 1974). The statewide effect required for three-judge court jurisdiction is present because the entire Florida prison system is affected by the Court's order. See e.g., Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800 (1941); Sands v. Wainwright, 491 F.2d 417, 421--422 (5th Cir. 1973), cert. denied, sub nom. Guajardo v. Estelle, 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974).
 
 
 103
 The result reached under this single judge court order as it is now framed creates the kind of event § 2281 was designed to protect against. '(T)he central concern of Congress in 1910 (when enacting the three judge court statute) was to prevent one federal judge from granting an interlocutory injunction against state legislation on grounds of federal unconstitutionality.' Florida Lime and Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80, 80 S.Ct. 568, 573, 4 L.Ed.2d 568 (1960). See generally, D. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 3--12 (1964). The order in this case presents that type of situation for here the impact of the order goes to Wainwright's inability to operate and maintain the Florida prison system constitutionally under present state legislation. The concession of unconstitutionality upon which the majority partially relies to avoid a three-judge court is not supported by the record. First, a concession by Wainwright could not be a concession by the State. Second, and more important, a concession that the prisons are overcrowded does not concede overcrowding to the point of an Eighth Amendment violation.
 
 
 104
 This is simply a different situation than in Newman v. Alabama, supra, upon which the majority relies, where the action was brought against the State of Alabama and various individuals, including the State Attorney General, the Warden at Mt. Meigs, the Alabama Board of Corrections, its Commissioner, Chairman and four members of the Board, as well as the hospital administrator and staff of the Medical and Diagnostic Center at Mt. Meigs. There the attack went to the deprivation of adequate medical care and the named defendants were precisely the people who could alleviate the problem. Likewise Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974), also relied upon by the majority, involved a different situation than in this case. In Gates the suit was against the Superintendent of the Mississippi Penitentiary, the members of the Mississippi Penitentiary Board and the Governor of the State, all parties who might properly effectuate the ordered relief.
 
 
 105
 There is little question that the record reflects conditions in Florida prisons which cry out for correction. But courts of law should attend carefully to the order of equitable relief only against those who are capable of complying with the order to correct the unconstitutional conditions. See, e.g., 27 Am.Jur.2d Equity §§ 105-109, at 626-633 (1966).
 
 
 106
 Wainwright should not be required to suffer the consequences of an order with which he has no legal capacity to comply, absent an injunction by a three-judge court against the operation of the statutes which would make his compliance illegal. The case should be remanded to permit the district court to grant only such relief against this defendant as he can provide without nullification of state statutes, to convene a three-judge court if that is deemed appropriate under the circumstances, and to permit, if proper, the joinder of other defendants whose activity is to be modified if the result sought by the district court order is to be achieved.
 
 
 
 [1]
 The court in its statement of facts made the following comment as to the Board's appointment: 'Doctor Babcock is a physician with a master's degree in hospital administration who is presently acting in the capacity of an independent consultant for hospitals and medical physicians. He spent over 10 years as a director of the Joint Commission on Accreditation of Hospitals and, since his retirement therefrom in 1964, has surveyed hundreds of hospitals, in hospital consultant capacity, to determine if they conformed to the standards established by the Joint Commission. Beginning in 1968, he began a survey for the Florida Division of Corrections of all the major penal institutions in Florida. The appointment of Doctor Babcock was not objectionable to any of the parties to this litigation.'
 
 
 [2]
 As to Dr. Alderete the trial court said:
 'Doctor Joseph Alderete is the hospital director and chief medical officer of the United States Penitentiary at Atlanta, Georgia. Doctor Alderete is trained as a psychiatrist and a surgeon, and besides his position as hospital director, he engages in the practice of both surgery and psychiatry. He was Chief of the Psychiatric Service at the United States Medical Center for Federal Prisoners in Springfield, Missouri. He received a one year appointment to Harvard Medical School as a Clinical and Research Fellow in electroencephalography. He holds an appointment with Emory University Medical School in Atlanta as a clinical instructor in psychiatry. In addition, interestingly enough, he was a correctional officer at the federal institution in LaTuna, Texas, prior to his entry into medical school. Doctor Alderete also testified as an expert witness in the case of Newman v. Alabama, 503 F.2d 1320 (5th Cir. 1974), cert. den. (421) U.S. (948) (95 S.Ct. 1680, 44 L.Ed.2d 102) (1975).
 
 
 [3]
 In a study entitled 'Overcrowding in the Florida Prison System' which is prepared for the Florida Division of Corrections by the American Justice Institute, 'emergency capacity of the prison system' was defined as 'the population beyond which the institution must be considered critically, and quite probably, dangerously overcrowded.' In his deposition defendant Wainwright used the same terminology which he testified was derived from the American Justice Institute's report
 
 
 [4]
 The trial court added the following language: 'By the defendant's own definition, which was adopted from the American Justice Institute's Report on Overcrowding in the Florida Prison System '(emergency capacity) represents the population beyond which the institution must be considered critically, and quite probably, dangerously overcrowded. It includes every bed in the institution which it is judged can safely be occupied at times of peak populations either due to intermittent and unpredictable population surges or to emergency and temporary circumstances within the institution or elsewhere in the division."